**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CENTRAL RABBINICAL CONGRESS OF THE USA & CANADA, *et al.*, <br><br>        *Plaintiffs*, <br><br> v. <br><br> NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE, *et al.*, <br><br>        *Defendants*. | Case No. 12-Civ-7590 <br><br> Judge Naomi Reice Buchwald |

---

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

---

Michael A. Carvin*
Shay Dvoretzky*
Yaakov Roth*
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone:  (202) 879-3939
Fax:  (202) 626-1700

*Counsel for Plaintiffs*

*application for admission pro hac vice
pending

Todd R. Geremia
JONES DAY
222 East 41st Street
New York, NY 10017
Phone: (212) 326-3939
Fax: (212) 755-7306

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

FACTUAL BACKGROUND ................................................................................. 3

ARGUMENT ......................................................................................................... 5

I.    PLAINTIFFS ARE LIKELY TO SHOW THAT THE REGULATION
      VIOLATES THE FIRST AMENDMENT BY CONSCRIPTING RELIGIOUS
      ACTORS TO TRANSMIT THE DEPARTMENT'S DEBATABLE HEALTH
      "ADVICE." ................................................................................................. 5

      A.    Compelling *Mohelim* To Convey the Department's Opposition to MBP Is
            Presumptively Invalid Under the First Amendment .............................. 6

      B.    The Regulation Cannot Be Defended Under the Line of Authority
            Permitting "Purely Factual and Uncontroversial" Disclosures by
            Commercial Actors and Regulated Professionals ................................. 9

            1.    *Mohelim are neither commercial actors nor regulated
                  professionals, and the grounds for reduced constitutional
                  protection are inapplicable here* ............................................. 10

            2.    *In any event, the regulation forces transmission of the
                  Department's subjective, value-laden advice and debatable,
                  unsettled facts, and is therefore not "purely factual" or
                  "uncontroversial."* ................................................................. 14

II.   PLAINTIFFS ARE LIKELY TO SHOW THAT THE REGULATION
      ABRIDGES THE FREE EXERCISE OF RELIGION BY TARGETING AN
      EXCLUSIVELY RELIGIOUS PRACTICE FOR SPECIAL AND
      UNWARRANTED BURDENS ................................................................. 21

      A.    Because § 181.21 Singles Out an Exclusively Religious Ritual for
            Disfavored Treatment, It Presumptively Violates the Federal Free Exercise
            Clause .................................................................................................. 22

      B.    Even Evaluated Under the Balancing Test Embodied in the New York
            Constitution, the Regulation Cannot Survive ..................................... 27

III.  PLAINTIFFS ARE THREATENED WITH IRREPARABLE HARM, BECAUSE
      DEPRIVATION OF FIRST AMENDMENT RIGHTS CANNOT BE
      REMEDIED .............................................................................................. 30

CONCLUSION .................................................................................................. 31

# TABLE OF AUTHORITIES

**Page**

CASES

*Aguilar v. Felton*,
   473 U.S. 402 (1985)...................................................................................13

*Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*,
   651 F.3d 218 (2d Cir. 2011)..........................................................................5

*Awad v. Ziriax*,
   754 F. Supp. 2d 1298 (W.D. Okla. 2010) ....................................................24

*Bd. of Trs. of the State Univ. of N.Y. v. Fox*,
   492 U.S. 469 (1989).....................................................................................10

*Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*,
   331 F.3d 342 (2d Cir. 2003)..........................................................................30

*Bronx Household of Faith v. Bd. of Educ. of the City of N.Y.*,
   No. 01 Civ. 8598, 2012 BL 44447 (S.D.N.Y. Feb. 24, 2012) ....................24

*Brown v. Entm't Merchants Ass'n*,
   131 S. Ct. 2729 (2011).............................................................................21, 26

*Cantwell v. Connecticut*,
   310 U.S. 296 (1940).....................................................................................13

*Catholic Charities of the Diocese of Albany v. Serio*,
   7 N.Y.3d 510 (2006)................................................................................28, 29

*Centro Tepeyac v. Montgomery Cnty.*,
   779 F. Supp. 2d 456 (D. Md. 2011).......................................................11, 12, 13

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993)............................................................................... passim

*Commack Sel.-Serv. Kosher Meats, Inc. v. Hooker*,
   680 F.3d 194 (2d Cir. 2012)..........................................................................23

*Conant v. Walters*,
   309 F.3d 629 (9th Cir. 2002) .......................................................................12

*Conn. Bar Ass'n v. United States*,
   620 F.3d 81 (2d Cir. 2010)...........................................................................15

*CTIA-The Wireless Ass'n v. City & Cnty. of S.F.*,
    827 F. Supp. 2d 1054 (N.D. Cal. 2011) .......................................................16, 21

*CTIA-The Wireless Ass'n v. City & Cnty. of San Francisco*,
    Nos. 11-17707, 11-17773, 2012 BL 233403 (9th Cir. Sept. 10, 2012) .......................15, 16, 17

*Employment Div. v. Smith*,
    494 U.S. 872 (1990).......................................................22, 23, 24, 28

*Entm't Software Ass'n v. Blagojevich*,
    469 F.3d 641 (7th Cir. 2006) .......................................................8, 15, 20, 27

*Evergreen Ass'n v. City of New York*,
    801 F. Supp. 2d 197 (S.D.N.Y. 2011).......................................................7, 11, 12, 13

*Fortress Bible Church v. Feiner*,
    2012 WL 4335158 (2d Cir. Sept. 24, 2012) .......................................................28

*Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*,
    100 F.3d 1287 (7th Cir. 1996) .......................................................25

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995).......................................................6, 8, 10, 20

*In re Primus*,
    436 U.S. 412 (1978).......................................................11

*In re R.M.J.*,
    455 U.S. 191 (1982).......................................................21

*Int'l Dairy Foods Ass'n v. Amestoy*,
    92 F.3d 67 (2d Cir. 1996) .......................................................30

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996).......................................................30

*Lowe v. SEC*,
    472 U.S. 181 (1985).......................................................9, 12

*Matter of Rivera v. Smith*,
    63 N.Y.2d 501 (1984).......................................................28, 29

*McIntyre v. Ohio Elections Commission*,
    514 U.S. 334 (1995).......................................................6, 7

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974).......................................................7

*Midrash Sephardi, Inc. v. Town of Surfside*,
    366 F.3d 1214 (11th Cir. 2004) ..............................................................25

*N.Y. State Restaurant Ass'n v. N.Y.C. Bd. of Health*,
    556 F.3d 114 (2d Cir. 2009)............................................................15, 17

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
    272 F.3d 104 (2d Cir. 2001)....................................................................15

*O'Brien v. Mayor & City Council of Balt.*,
    768 F. Supp. 2d 804 (D. Md. 2011) ...................................................11, 12

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
    475 U.S. 1 (1986)........................................................................................7

*People v. Woodruff*,
    26 A.D.2d 236 (N.Y. App. Div. 1966) ......................................................28

*Planned Parenthood Minn., N.D., S.D. v. Rounds*,
    530 F.3d 724 (8th Cir. 2008) (en banc) ...................................................10

*Planned Parenthood Minn. v. Rounds*,
    686 F.3d 889 (8th Cir. 2012) (en banc) ...................................................14

*Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833 (1992)...............................................................................9, 12

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992)....................................................................................7

*R.J. Reynolds Tobacco Co. v. FDA*, 2012 WL 3632003 (D.C. Cir. Aug. 24, 2012) ...................14

*Reno v. Am. Civil Liberties Union*,
    521 U.S. 844 (1997)....................................................................................8

*Sable Commc'ns of Cal., Inc. v. FCC*,
    492 U.S. 115 (1989)...............................................................................8, 27

*Shrum v. City of Coweta*,
    449 F.3d 1132 (10th Cir. 2006) ...............................................................25

*Stormans Inc. v. Selecky*,
    844 F. Supp. 2d 1172 (W.D. Wash. 2012)................................................22

*Tex. Med. Providers Performing Abortion Servs. v. Lakey*,
    667 F.3d 570 (5th Cir. 2012) ......................................................14, 15, 21

*UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*,
    660 F.3d 643 (2d Cir. 2011)......................................................................5

*United States v. Playboy Entm't Grp., Inc.*,
   529 U.S. 803 (2000) .............................................................................................7

*Video Software Dealers Ass'n v. Schwarzenegger*,
   556 F.3d 950 (9th Cir. 2009) ...............................................................................8

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ..........................................................................................6, 7

*Wooley v. Maynard*,
   430 U.S. 705 (1977) ..............................................................................................6

*Zakhartchenko v. Weinberger*,
   605 N.Y.S.2d 205 (Sup. Ct. 1993) .....................................................................13

*Zauderer v. Office of Disciplinary Counsel*,
   471 U.S. 626 (1985) ...................................................................................... passim

## STATUTES

N.Y.C. Administrative Procedure Act, § 1043(f)(1) ...................................................4

## OTHER AUTHORITIES

*Code of Jewish Law, Yoreh De'ah*, at 260:1 .............................................................11

Debbie Maimon, Behind the Campaign Against Metzitzah B'peh, YATED NE'EMAN, July
   13, 2012.................................................................................................................19

Douglas Laycock, *A Syllabus of Errors*, 105 MICH. L. REV. 1169, 1184 (2007) ........25

L. Rubin & P. Lanzkowsky, *Cutaneous Neonatal Herpes Infection Associated with Ritual
   Circumcision*, 19 PEDIATRIC INFECTIOUS DIS. J. 3:266 (2000) ...............................19

R. Whitley & B. Roizman, *Herpes Simplex Virus Infections*, THE LANCET 357:1513
   (2001)....................................................................................................................19

Sharon Otterman, *City Urges Requiring Consent for Jewish Rite*, N.Y. TIMES, June 12,
   2012...................................................................................................................4, 24

Tracy Bateman Farrell, 83A N.Y. JUR. 2d, Physicians, Surgeons, and Other Healers § 53 ..........13

## INTRODUCTION

The ritual of *bris milah*, or circumcision, is one of the most basic, most important, and most widely practiced Jewish traditions.  For thousands of years, Jews have faithfully adhered to the commandment to circumcise every male child on the eighth day after his birth.  Now, acting on the basis of sparse and deficient research, and in the midst of ongoing medical debate, the defendants (collectively, "the Department")—have targeted one critical aspect of the *bris milah*, known as *metzitzah b'peh* ("MBP"), and are attempting to conscript *mohelim*, who perform this sacred act, into advocates for the Department's ill-founded opposition to the practice.

MBP involves the use of oral suction by the *mohel* (the individual who performs the circumcision) to draw blood from the wound, and many prominent rabbinic authorities maintain that MBP is the proper, or even the *only acceptable*, way to complete the circumcision under Jewish law.  MBP has been performed safely for millennia.  Yet, under a new regulation, the Department will force *mohelim* to convey the Department's "advi[ce]" that MBP, a religiously mandated ritual practice, "should not be performed," because it allegedly "exposes an infant to the risk of transmission of herpes simplex virus infection, which may result in brain damage or death."  The parent would then be required to record his or her consent to the procedure.  This regulation tramples on constitutional rights, including those of the plaintiffs here, in two ways.

*First*, by compelling *mohelim* to transmit to parents the Department's subjective, value-laden opinion that MBP "should not be performed," the regulation violates freedom of speech.  Basic First Amendment principles hold that the government cannot *force* speech any more than it can *proscribe* speech.  If the Department wants to speak to the public, it may do so directly—but not by requiring those who disagree with the message to transmit it on the Department's behalf.

Although purely factual and uncontroversial disclosures may permissibly be compelled in the context of a *commercial transaction* or exercise of a *licensed profession*, it would be a novel

and substantial offense against the First Amendment to require such warnings in the context of a *religious ritual*.  In any event, the message compelled by the Department's new regulation fails the minimal requirements that courts have imposed upon disclosures even in such less protected settings—namely, that they be "purely factual" and "uncontroversial."  The message is not a *fact* at all, but rather a piece of *advice*—that MBP "should not be performed" because its purported health risks outweigh, in the Department's view, its religious necessity.  And the alleged risks are hardly "uncontroversial."  To the contrary, the Department's concerns are premised on limited study, dubious assumptions, and tiny sample sizes—and remain actively disputed by doctors.

*Second*, by singling out an exclusively religious ritual for unique burdens, the regulation violates the Free Exercise Clauses of the First Amendment and the New York Constitution.  The Department has not imposed neutral, generally applicable rules to prevent transmission of the herpes virus, or to limit all oral contact with newborns.  Rather, it has targeted MBP, and MBP alone—a practice that nobody engages in *other than* out of religious motivations—for a special regulatory regime.  That regime requires *mohelim* to advise against their own religious beliefs and obtain a special, written consent that the Department has not required for *any other* practice, notwithstanding the numerous risks—large and small—to which we expose ourselves (and our children) daily.  Under federal Free Exercise jurisprudence, such a regulation could be sustained only on the most compelling showing—a showing that the current inconclusive and (at best) debatable data do not begin to satisfy.  Indeed, even accepting the Department's assumptions and conclusions at face value, the regulation's effect on transmission of herpes is entirely unproven, and likely marginal at best, given that those who believe that MBP is a divine commandment are very unlikely to be swayed by unsolicited advice from municipal bureaucrats.  The regulation therefore cannot even survive the balancing test applicable under New York's Constitution.

If the Department's regulation is permitted to take effect, *mohelim* across New York City will suffer irreparable injury. Infringement on First Amendment rights cannot, as courts have uniformly recognized, be remedied after-the-fact. Accordingly, this Court should issue a preliminary injunction suspending enforcement of the regulation during this litigation.

To be clear, Judaism places the highest premium on protection of human life, especially the life of children. Any chance that a religious practice endangers children's safety deserves careful and thorough study. But the Department has not undertaken that study. Instead, it has rushed to regulation on the basis of literally a handful of alleged cases over a period of years—a small fraction of the total number of reported cases of neonatal herpes—none of which has been definitively traced to MBP, and which even when taken together do not establish any statistically significant association between MBP and herpes, much less a causal link. In short, neither the law nor the facts justify the Department's unprecedented and unconstitutional regulation.

## FACTUAL BACKGROUND

**A.** One of the essential steps of the *bris milah* ritual is *metzitzah*, during which suction is used to draw blood from the area around the wound. *See* Babylonian Talmud, Tractate Shabbat, at 133b. Traditionally, *metzitzah* is performed using direct oral suction, in a technique known as *metzitzah b'peh* ("MBP"). *Mohelim*, the individuals who perform ritual circumcisions, are carefully trained to ensure that the practice is performed in a safe manner. Among other precautions, *mohelim* do not perform circumcisions if they are exhibiting any symptoms of the herpes simplex virus ("HSV"), such as cold sores; they minimize the duration of the oral-genital contact, so that it lasts only approximately one second; and they generally precede the procedure by rinsing their mouths with an antiseptic, which in the case of mouthwash has been shown to kill the herpes virus in saliva. (*See* Aff. of Rabbi Levi Y. Heber ("Heber Aff."), ¶¶ 4, 6–7; *see also* Aff. of Dr. Daniel Berman, M.D. ("Berman Aff."), ¶ 20.)

3

**B.**      In June 2012, the Department issued a notice of public hearing to address a proposed amendment to Article 181 of the New York City Health Code.  (*See* Decl. of Todd Geremia ("Geremia Decl."), ¶ 2 & Exh. 1.)  The proposal called for a new § 181.21, which—according to the its statement of basis and purpose—was designed to target the "practice known as *metzitzah b'peh*."  (*Id.*)  In the media, the Department described the regulation as an effort to "regulat[e] how part of a religious procedure is done."  Sharon Otterman, *City Urges Requiring Consent for Jewish Rite*, N.Y. TIMES, June 12, 2012, at A23.  After public comment and hearing, the Board of Health voted in September 2012 to adopt a revised version of the proposal.  (*See* Geremia Decl., ¶ 3 & Exh. 2.)  As adopted, the regulation compels *mohelim* to inform parents that "the [Department] advises parents that direct oral suction should not be performed because it exposes an infant to the risk of transmission of herpes simplex virus infection, which may result in brain damage or death."  (*Id.*)  The parent must then provide "written signed and dated consent," which must be retained for one year.  (*Id.*)

While the regulation is scheduled to take effect on October 21, 2012, *see* N.Y.C. Administrative Procedure Act, § 1043(f)(1), the Department has agreed to a temporary stay of its enforcement pending oral argument on this motion, which is scheduled for November 14, 2012.

**C.**      Plaintiffs are the Central Rabbinical Congress of the United States and Canada, the Agudath Israel of America, and the International Bris Association; and three *mohelim*, Rabbis Samuel Blum, Aharon Leiman, and Shloime Eichenstein.  The plaintiff organizations represent traditional Judaism, and are devoted to the *bris milah* ritual.  Among their members are numerous *mohelim* who believe that MBP is mandated by Jewish law and critical to proper completion of the ritual circumcision.  Likewise, the plaintiff *mohelim* believe that, under Jewish law, *metzitzah* is to be performed using direct suction, and therefore always perform MBP when

4

they conduct a circumcision.  (*See* Aff. of Rabbi Samuel Blum ("Blum Aff."), ¶¶ 1–3; Aff. of Rabbi Aharon Leiman ("Leiman Aff."), ¶¶ 1–3; Aff. of Rabbi Shloime Eichenstein ("Eichenstein Aff."), ¶¶ 1–3.)  These *mohelim* object to being forced to transmit the Department's opinion that MBP ought not be performed.  (*See* Blum Aff. ¶¶ 4–5; Leiman Aff. ¶¶ 4–5; Eichenstein Aff. ¶¶ 4–5.)  They also object to being forced to tell parents that MBP "exposes an infant to the risk of transmission of herpes simplex virus infection."  (*See id.*)  The *mohelim* believe that MBP, performed using appropriate precautions, is safe, and that the mandated warning will mislead parents, possibly causing them to violate Jewish law.  (*See id.*)

## ARGUMENT

To preliminarily enjoin government action, a plaintiff must show a "likelihood of success on the merits" and that "irreparable harm" will result if the status quo is not preserved.  *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 647 (2d Cir. 2011); *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 230 (2d Cir. 2011).  Here, the plaintiffs are likely to succeed on the merits, and failure to stay the regulation will cause irreparable injury, because the deprivation of First Amendment rights cannot be remedied.

I.  **PLAINTIFFS ARE LIKELY TO SHOW THAT THE REGULATION VIOLATES THE FIRST AMENDMENT BY CONSCRIPTING RELIGIOUS ACTORS TO TRANSMIT THE DEPARTMENT'S DEBATABLE HEALTH "ADVICE."**

Section 181.21 compels *mohelim* to pass along the Department's "advice" against MBP, a ritual that the plaintiff *mohelim* consider to be both safe and divinely mandated.  Compelling speech, however, is forbidden by the First Amendment, unless the government has a truly critical need to disseminate the information and no way to do so itself.  And, while the government is permitted, in the commercial realm and in connection with regulation of licensed professionals, to require disclosure of purely factual and uncontroversial information, neither the individuals governed by § 181.21 (*i.e.*, *mohelim*, who do not demand payment and are not licensed by

government) nor the information that the regulation compels them to provide (*i.e.*, that the Department "advises" against MBP because of its alleged risks) falls within that doctrine.

A.   **Compelling *Mohelim* To Convey the Department's Opposition to MBP Is Presumptively Invalid Under the First Amendment.**

1.   "[O]ne important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.'" *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (quoting *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 11 (1986)).  That basic principle applies most obviously when the government attempts to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Thus, schoolchildren cannot be forced to say the pledge of allegiance, *id.*, and New Hampshire could not require drivers in that state to display on their license plates a motto—"Live Free or Die"—which some considered to be "repugnant to their moral, religious, and political beliefs." *Wooley v. Maynard*, 430 U.S. 705, 707 (1977).  But the doctrine of compelled speech is not limited to compelled affirmations of opinions or ideas.  To the contrary, the principle barring compelled speech "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid."  *Hurley*, 515 U.S. at 573.  Thus, in *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), the Court invalidated a law that required anyone distributing campaign literature to include on it the name of the person or entity responsible for the literature, even though such a disclosure would obviously have been factually accurate.  *See id.* at 357.  Likewise, the Court in *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781 (1988), invalidated a law that "require[d] professional fundraisers to disclose to potential donors the gross percentage of revenues retained in prior charitable solicitations," even though that information was indisputably true.  *Id.* at 784.

6

2.      Laws that compel speech are subject to highest level of judicial scrutiny, namely, strict scrutiny.  *Id.* at 795, 798; *Evergreen Ass'n v. City of New York*, 801 F. Supp. 2d 197, 203–04 (S.D.N.Y. 2011).   Strict scrutiny requires the government to demonstrate a compelling interest for its action; to show that its regulation is narrowly tailored to advance that interest; and to prove that there are no less-restrictive means by which the government's interest could be met.  *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000).   The standard is so difficult to satisfy that "[c]ontent-based regulations," such as those compelling speech, are "presumptively invalid."  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

3.      Section 181.21 requires *mohelim* to inform parents that "the [Department] advises parents that direct oral suction should not be performed because it exposes an infant to the risk of transmission of herpes simplex virus infection."   This is a quintessential example of compelled speech; the regulation transforms the *mohel* into the Department's mouthpiece, requiring him to transmit a government-dictated message.   Indeed, because the regulation requires the *mohel* to transmit *advice* about whether to follow religious law or instead transgress, it is foreclosed by a "fixed star in our constitutional constellation"—that the government may not "prescribe what shall be orthodox in … religion, or other matters of opinion."  *Barnette*, 319 U.S. at 642.  *Risk* itself may be a matter of fact, but the choice whether to engage that risk or avoid it is a matter of *judgment*.   And it is the Department's judgment that § 181.21 compels the *mohel* to disseminate, by informing parents that the Department "advises" that MBP "should not be performed."[1]

---

[1] The constitutional violation is not ameliorated at all by the fact that the disclosure identifies the Department as the source of the advice, as the *mohelim* are still being forced to give voice to that advice. *See Pac. Gas & Elec. Co.*, 475 U.S. at 9–12 (invalidating rule requiring company to provide space in newsletter to publish third party's views, even though they would be identified as such); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 254-58 (1974) (invalidating law requiring newspapers to provide space for political candidates to respond to criticism, even though replies would be identified as such).

Moreover, even the portion of the disclosure that is purportedly factual in nature—that MBP "exposes an infant to the risk of transmission of herpes simplex virus infection"—triggers strict scrutiny. *See Hurley*, 515 U.S. at 573. "[C]ompelled statements of 'fact,'" no less than compelled affirmations of belief, "burden[] protected speech." *Riley*, 487 U.S. at 797–98.

4.      Whichever aspect of the compelled disclosure one looks to, therefore, § 181.21 is subject to strict scrutiny. The regulation cannot, however, pass that demanding test.

As explained further below, the Department has not demonstrated a compelling interest for its regulation, or adopted a narrowly tailored method to advance its purported interest. *See infra* at I.B.2.b & II.A.4. But, to establish the unconstitutionality of the regulation under strict scrutiny, it suffices that compelling speech by *mohelim* is plainly not the least-restrictive means of conveying to the public what (in the Department's view) are the risks of MBP. *See Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) (holding that strict scrutiny requires "least restrictive means to further the articulated interest"); *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 879 (1997) (same). Where the government could publicize its own message, compelled speech is not the least-restrictive means of communicating with the public. Thus, in *Riley*, the Court noted that the goals of disclosure could be served equally well if the State "itself publish[ed] the detailed financial disclosure forms." *Riley*, 487 U.S. at 800; *see also Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 965 (9th Cir. 2009) (finding "enhanced education campaign" to be "less-restrictive means" of achieving goal).

The same is true here. If the Department wants to speak to parents about the alleged risks of MBP, it need not conscript an army of *mohelim* marionettes. Instead, it could, consistent with the Free Speech Clause, "accomplish [its] goal with a broader educational campaign," *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006), *e.g.*, by publishing and

distributing pamphlets.  Indeed, the Department has already begun to do just that.  (*See* Geremia

Decl., ¶ 4 & Exh. 3.)  To be sure, the plaintiffs object to these brochures, believing them to be a

false and unreasonable interference into a religious matter.  Yet, under the Free Speech Clause,

the Department is entitled to spread its view, so long as it does so itself; and, for purposes of that

Clause, the Department's independent efforts to spread its message about MBP proves that it

lacks the need—and thus the legal authority—to compel *mohelim* to do the same.

> **B.     The Regulation Cannot Be Defended Under the Line of Authority Permitting "Purely Factual and Uncontroversial" Disclosures by Commercial Actors and Regulated Professionals.**

The Department may attempt to defend § 181.21 as analogous to the health warnings that

manufacturers must print on product labels and doctors must provide to patients.  To be sure, in

the context of "commercial advertising," the government may compel "purely factual and

uncontroversial" disclosures.  *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651

(1985).  Likewise, the government may require factual disclosures by licensed professionals, as

part of its comprehensive regulation of the profession.  *Lowe v. SEC*, 472 U.S. 181, 232 (1985)

(White, J., concurring in the judgment).  *See, e.g.*, *Planned Parenthood of Se. Pa. v. Casey*, 505

U.S. 833, 884 (1992) (plurality op.) (allowing compelled disclosure by abortion doctor, "but only

as part of the practice of medicine, subject to reasonable licensing and regulation by the State").

But these authorities are doubly inapplicable here.  *First*, *mohelim* are neither commercial

actors nor regulated professionals.  They are, rather, unlicensed (and unlicenseable) religious

ministers who demand no payment for their services, making inapt the rationales that exist for

reduced scrutiny in the other contexts.  *Second*, the regulation compels a disclosure that is

*neither* purely factual *nor* uncontroversial.  To the contrary, it is subjective, value-laden advice,

justified by dubious "facts" that are the subject of ongoing debate in the medical community.

1.    *Mohelim are neither commercial actors nor regulated professionals, and the grounds for reduced constitutional protection are inapplicable here.*

Although compelled speech is generally forbidden, the government may mandate "purely factual and uncontroversial" disclosures by those "propos[ing] a commercial transaction," to prevent consumer deception. *Zauderer*, 471 U.S. at 637, 651.  Similarly, meaningful regulation of a licensed profession may require compelling the professional to provide clients with certain truthful, non-misleading facts.  *See Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 734-35 (8th Cir. 2008) (en banc).  Neither exception applies here, however, as § 181.21 cannot be fairly categorized as a regulation of either commercial or professional speech.  The government may not compel a *mohel* to issue the § 181.21 disclosure any more than it may dictate the contents of a rabbi's sermon or supervise a priest's counseling of a congregant.

a.    *Zauderer* reasoned that permitting compelled disclosure of certain factual information is warranted in the special context of commercial speech, a category always entitled to "protection somewhat less extensive." 471 U.S. at 637.  When only a commercial transaction is involved, "the interests … are not of the same order." *Id.* at 651.  But when the "nature of the speech taken as a whole" cannot be characterized as commercial, as with charitable solicitations in *Riley*, the test "for fully protected expression" applies.  487 U.S. at 796 & n.9.  "Although the State may at times prescribe what shall be orthodox in commercial advertising …, outside that context it may not" depart from the "general rule" to the contrary.  *Hurley*, 515 U.S. at 573.  Here, the special *Zauderer* rule plainly does not apply, because *mohelim* performing ritual circumcisions are involved in a *religious act*, not a *commercial transaction*.

"[T]he difference between commercial and noncommercial speech" is that the former is "define[d]" as "speech that *proposes* a commercial transaction."  *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989).  That is, commercial speech is "expression related solely

10

to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980).  Courts thus routinely look to the presence or absence of economic motive in determining whether speech is commercial.  *Compare Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 457, 468 (1978) (upholding prohibition on "[i]n-person solicitation by a lawyer of remunerative employment"), *with In re Primus*, 436 U.S. 412, 422 437–38 & n.32, 439 (1978) (distinguishing *Ohralik* in case involving *pro bono* solicitation).

In a series of recent cases, every court to consider the question held that strict scrutiny applied to municipal regulations that sought to require pregnancy counseling centers—including centers opposed to abortion on moral grounds—to post signs indicating that they did not provide abortion services.  *See Evergreen Ass'n*, 801 F. Supp. 2d 197; *O'Brien v. Mayor & City Council of Balt.*, 768 F. Supp. 2d 804 (D. Md. 2011), *aff'd*, 683 F.3d 539 (4th Cir. 2012); *Centro Tepeyac v. Montgomery Cnty.*, 779 F. Supp. 2d 456 (D. Md. 2011), *aff'd*, 683 F.3d 591 (4th Cir. 2012).[2] These courts reasoned that the pregnancy centers were providing "free" services "in furtherance of a religious belief," not acting out of economic interest, and therefore that their speech could not be characterized as commercial in nature.  *Evergreen Ass'n*, 801 F. Supp. 2d at 204–206; *O'Brien*, 768 F. Supp. 2d at 813–14; *Centro Tepeyac*, 779 F. Supp. 2d at 463–64.

The same reasoning applies here.  The performance of a ritual circumcision is obviously not a commercial transaction.  No commercial transaction is proposed, and no economic motive is at issue.  Indeed, the Code of Jewish Law requires *mohelim* to perform circumcisions without regard to payment.  *See Code of Jewish Law, Yoreh De'ah*, at 260:1 & 261:1.  And *mohelim*, including the plaintiff *mohelim*, therefore perform their services without asking for any economic benefit.  (*See* Blum Aff., ¶ 6; Leiman Aff., ¶ 7; Eichenstein Aff., ¶ 6; *see also* Heber Aff., ¶ 8.)

---

[2] The Fourth Circuit's decisions affirming these district courts are being reheard en banc.

Perhaps even more importantly, ritual circumcision is a *religious* act; motivated by spiritual belief.  The offer of free services "in furtherance of a religious mission" simply cannot be deemed commercial speech.  *See Evergreen Ass'n*, 801 F. Supp. 2d at 205; *Centro Tepeyac*, 779 F. Supp. 2d at 463–64; *O'Brien*, 768 F. Supp. 2d at 813.  To hold otherwise would be a "breathtaking expansion of the commercial speech doctrine," as "'any house of worship offering their congregants sacramental wine, communion wafers, prayer beads, or other objects with commercial value, would find their accompanying speech subject to diminished constitutional protection.'"  *Evergreen Ass'n*, 801 F. Supp. 2d at 205 (quoting *O'Brien*, 768 F. Supp. 2d at 814).

    b.    Similarly, while "[b]eing a member of a regulated profession does not … result in a surrender of First Amendment rights," *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002), some courts have recognized that the government may regulate speech as part of its power to regulate licensed professions.  Some professions necessarily involve speech—such as lawyers or doctors providing advice to clients or patients—and the power "to regulate the professions is not lost whenever the practice of a profession entails speech." *Lowe*, 472 U.S. at 228 (White, J., concurring in the judgment).  Thus, the government may require professionals to obtain licenses before they engage in certain speech, *see, e.g.*, *id.*, and may also regulate some aspects of licensed professionals' speech.  For example, the Supreme Court has upheld laws requiring doctors to make certain disclosures before performing abortions; this was "part of the practice of medicine, subject to reasonable licensing and regulation by the State." *Planned Parenthood*, 505 U.S. at 884.  As with commercial speech, this doctrine reflects a narrow exception in a unique context, where regulation is the norm and First Amendment interests are particularly reduced.

The professional speech doctrine cannot be applied in defense of § 181.21. *Mohelim* in New York are not licensed or specifically regulated by the government.  While "a circumcision

performed by a physician would be the practice of medicine," it is also true that "a circumcision performed as a religious ritual by a qualified person … does not constitute the practice of the profession of medicine." *Zakhartchenko v. Weinberger*, 605 N.Y.S.2d 205, 206 (Sup. Ct. 1993); *accord* Tracy Bateman Farrell, 83A N.Y. JUR. 2d, Physicians, Surgeons, and Other Healers § 53, n.2. Because *mohelim* are not licensed professionals, and are not subject to comprehensive vocational regulation, the Department cannot purport to regulate their speech as part of a broader licensing or regulatory regime. Again, the pregnancy center cases are on point: They rejected application of the professional speech doctrine to the centers, which (even though they provided ultrasounds) were "not engage[d] in the practice of medicine." *Evergreen Ass'n*, 801 F. Supp. 2d at 207; *Centro Tepeyac*, 779 F. Supp. 2d at 465. Were professional speech doctrine applicable even absent an actual regulatory regime, it would swallow the law of compelled speech. The limiting principle thus must be the one adopted by *Evergreen*: Professional speech restrictions are permissible only as ancillary elements to *existing* professional regulatory regimes.

In any event, religious actors like *mohelim* are among the few things that the government actually *could not* license and regulate. The professional speech doctrine is thus particularly inapt here. Indeed, it would be unthinkable for the government to attempt to impose on priests, rabbis, or imams the type of all-encompassing, comprehensive regulatory and licensing regimes that govern the medical and legal professions. Such a practice would raise the most serious Establishment Clause concerns. *See Aguilar v. Felton*, 473 U.S. 402, 413 (1985) ("[P]ervasive monitoring by public authorities … infringes precisely those Establishment Clause values at the root of the prohibition of excessive entanglement."); *Cantwell v. Connecticut*, 310 U.S. 296, 307 (1940). *Mohelim*, because they lead the practice of a religious ritual, are analogous. In short, some "professions," owing to their religious character, are simply outside the regulatory sphere.

       c.     Expanding the commercial or professional speech doctrines to permit the government to compel speech by religious actors would open the door to a host of absurd regulations.  Could the Department require rabbis to announce publicly at their synagogues that the Department "advises" that pregnant women refrain from fasting on Yom Kippur, because it could cause dehydration and thus harm the fetus?  Could the Department force priests to warn that communal sharing of a single cup during communion presents a risk of transmitting disease?  Although these risks do exist, surely none of these compulsions could survive constitutional scrutiny.  The reason—also the reason why § 181.21 must fail—is that, unlike the commercial and professional contexts, First Amendment protection is at its *apex* in these religious contexts.

       **2.**      *In any event, the regulation forces transmission of the Department's subjective, value-laden advice and debatable, unsettled facts, and is therefore not "purely factual" or "uncontroversial."*

      Even if ritual circumcision could be categorized as a mere commercial transaction or the performance of a professional duty subject to reduced constitutional protection, § 181.21 would still be unconstitutional, because the regulation requires *mohelim* to transmit the Department's subjective opinion about the relative costs and benefits of MBP, and to recite as "fact" a theory that remains debated in the medical world.  Yet the minimum requirement for *any* government-mandated disclosure is that it be purely factual, truthful, undisputed, and non-misleading.

      Uncontroversial factual accuracy is the *sine qua non* of any mandated disclosure.  The speech must involve "clear statements that [a]re both indisputably accurate and not subject to misinterpretation."  *R.J. Reynolds Tobacco Co. v. FDA*, 2012 WL 3632003, at *7 (D.C. Cir. Aug. 24, 2012).  The information provided must be "truthful, nonmisleading, and relevant."  *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 576 (5th Cir. 2012); *accord Planned Parenthood Minn. v. Rounds*, 686 F.3d 889, 893 (8th Cir. 2012) (en banc).  Courts have thus permitted only disclosures that involve *indisputable* facts.  *See, e.g.*, *Zauderer*, 471 U.S. at

633 (disclosure by attorneys that contingent-fee clients are liable for costs); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113 (2d Cir. 2001) (disclosure by manufacturers that products contain mercury); *N.Y. State Restaurant Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114, 134 (2d Cir. 2009) (disclosure by restaurants of caloric information); *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 94–100 (2d Cir. 2010) (disclosure by debt relief agencies of facts about bankruptcy).

Subjective opinion is "a much different animal." *R.J. Reynolds.*, 2012 WL 3632003, at *7. "[F]actual information" may sometimes be compelled, but "positions or arguments" may never be. *Lakey*, 667 F.3d at 577 n.4. Thus, Illinois could not require video-game retailers to affix a sticker stating "18" onto games that fell within the State's definition of "sexually explicit," as that label constituted an "opinion-based," "subjective and highly controversial message." *Blagojevich*, 469 F.3d at 651–52. Likewise, the FDA could not compel tobacco companies to print on their product labels "images of a woman crying, a small child, and the man wearing a T-shirt emblazoned with the words 'I QUIT,'" as those images could not "be viewed as pure attempts to convey information." *R.J. Reynolds*, 2012 WL 3632003, at *8. And San Francisco could not compel cellular phone providers to issue the City's "recommend[ations]" about how to use the phones (including about use by children), because the disclosure "contained more than just facts"; it also conveyed "recommendations as to what consumers should do" and the "opinion that using cell phones is dangerous." *CTIA-The Wireless Ass'n v. City & Cnty. of S.F.*, Nos. 11-17707, 11-17773, 2012 BL 233403, at *1–2 (9th Cir. Sept. 10, 2012) (unpub.).

Even if a mandated disclosure purports to be factual, the First Amendment forbids its compulsion if the alleged facts are reasonably disputed. Whether because such disputed facts are not "uncontroversial," *Zauderer*, 471 U.S. at 651, or because they are more fairly characterized as opinions, the law is clear. Thus, San Francisco's cell phone disclosures were unconstitutional

15

not only because they compelled dissemination of recommendations, but also because they left an "impression … that cell phones are dangerous," even though "cell phones have not been proven dangerous," only labeled as "possibly" carcinogenic by the World Health Organization. *CTIA-The Wireless Ass'n v. City & Cnty. of S.F.*, 827 F. Supp. 2d 1054, 1062-63 (N.D. Cal. 2011), *aff'd*, 2012 BL 233403, at *1–2 (affirming because of "debate in the scientific community about the health effects of cell phones").  In short, government may sometimes require disclosure of uncontroverted facts, but can never force individuals to adopt one side of a legitimate debate.

Here, even if § 181.21 *were* a regulation of only commercial or professional speech, it still could not survive, because the information that it compels *mohelim* to transmit is not "purely factual and uncontroversial."  *First*, the compelled disclosures are not "purely factual," because the regulation forces *mohelim* to convey the Department's subjective advice about MBP.  *Second*, even the alleged risks of MBP are only *alleged*; they are not "uncontroversial," but rather reflect one side of an ongoing medical debate.  And *third*, the warning is imprecise and confusing.

a. By its very terms, § 181.21's required language expresses an opinion, not a fact.  It "advises" parents, suggesting that they "should not" take a particular course.  This is classic language of advocacy.  It reflects the Department's subjective opinion that MBP "should not" be performed because avoiding its risks is more important than adhering to Jewish law.  But that is a *value judgment*, not a fact.  Indeed, in this regard, § 181.21 cannot be distinguished from San Francisco's "recommendations" about using cell phones, *see CTIA-The Wireless Ass'n*, 2012 BL 233403, at *1–2, or from the FDA's attempt to force tobacco manufacturers to display "1-800-QUIT-NOW" on cigarette packs, conveying the subjective view that smoking's health risks outweigh its benefits.  *R.J. Reynolds*, 2012 WL 3632003, at *8.  Even the *dissenting judge* there agreed that the "QUIT-NOW" message could not survive.  *Id.* at *13 (Rogers, J., dissenting).

In sum, the government can require restaurants to tell a customer the undisputed fact that the hamburger he is about to eat contains 800 calories, *see N.Y. State Restaurant Ass'n*, 556 F.3d at 134, but cannot compel that restaurant to advise the customer (or convey the State's advice) that the customer therefore should not eat the hamburger. Yet § 181.21 effectively does just that.

b. Moreover, "there is debate in the scientific community about the health effects" of MBP, and so the Department cannot claim that its warnings regarding the risks of that practice are purely factual and uncontroversial. *CTIA-The Wireless Ass'n*, 2012 BL 233403, at *1. In fact, medical knowledge on MBP is far from settled. As the attached affidavits show, a causal link between MBP and the herpes virus ("HSV") has never been proved. Rather, the Department is relying on an inference from a supposed correlation—but the latter is premised on limited study, faulty assumptions, and methodological errors, and conflicts with other evidence.

As explained by Dr. Daniel Berman, an infectious disease specialist in New York, it would be fairly straightforward to use DNA fingerprinting to ascertain whether an infant with neonatal herpes was actually infected by a *mohel*. Indeed, such a process has been used by other studies of HSV. *Yet not a single case of HSV has ever been so proved to have been caused by transmission through MBP*. (*See* Berman Aff., ¶ 19.) Instead of proof of causation, the Department relied on its alleged discovery of "11 cases," over more than eleven years, of HSV "in male infants following circumcisions that were likely to have been associated with [MBP]." (Geremia Decl., ¶ 3 & Exh. 2.) According to a study of those cases by Department staff (the "Department's report," *see* Geremia Decl., ¶ 5 & Exh. 4), the incidence of HSV among boys suspected to have had MBP is higher—by a margin that is *barely* statistically significant—than the incidence among the general population. However, the data, methodology, assumptions, and conclusions of the Department's report are deeply flawed:

- In calculating the baseline, expected rate of incidence of HSV-1 (the type of HSV at issue), the Department's report relies upon the number of cases reported between 2006 and 2011.  That calculation produces a *diagnosis* rate, however, not the rate of *incidence*.  A case of HSV-1 would only have been reported if the examiner suspected, and tested for, HSV-1; as a result, some cases likely were missed.  (Berman Aff., ¶ 14.)  Although the report also relied on reported cases to determine incidence among infants suspected to have had MBP, diagnosis in that situation would be *more likely*—because of the heightened awareness to the possible transmission of HSV through MBP.  (*Id.*; *see also* Geremia Decl. ¶ 6 & Exh. 5 (health alert).)

- The Department's estimate of the number of infants who had MBP during the study period is highly questionable.  By using kindergarten enrollment data, Dr. Awi Federgruen of Columbia University, an expert in quantitative methodology, estimates the total number of MBP circumcisions in New York City over the period at issue to be about 50% higher than estimated by the Department.  (*See* Aff. of Dr. Awi Federgruen ("Federgruen Aff."), ¶¶ 5–9 & Exh. 1.)  That figure is consistent with population studies that report high birthrates among Orthodox families in New York City over the last few years.  (Federgruen Aff. ¶ 8 & Exh. 2; Berman Aff., ¶ 15 & Exh. 2).  Correcting that single error deprives the report's findings of statistical significance—even *accepting* its dubious assumptions that only 50% of the yeshiva population and *nobody* outside the yeshiva and Hasidic communities practices MBP.  (Federgruen Aff., ¶¶ 10–12.)  Thus, the Department's estimate of the instances of MBP—and thus the projected number of cases of HSV-1 among that group—is far too low.

- Further, in characterizing five cases of HSV (over nearly six years) as associated with MBP, the Department's report makes numerous errors.  For one, only *two* cases were "confirmed" to have involved MBP, and further investigation provides reason to doubt even the

accuracy of those.  (*See* Berman Aff., ¶ 12.)  Moreover, one of the two confirmed cases involved *untyped* HSV, not confirmed to be HSV-1.  (*See id.*)  Additionally, two of the cases involve *siblings*, suggesting contraction of the disease from a common household source (or from one another).  (*See id.*¶ 13.)  Furthermore, in one of the five cases, there is reason to believe that the virus was actually transmitted from a symptomatic sibling, who had extended and close physical contact with the infant.  (*See id.*)  *See* Debbie Maimon, *Behind the Campaign Against Metzitzah B'peh*, YATED NE'EMAN, July 13, 2012.  Finally, in one of the cases, the infant began to exhibit symptoms only 20 days after circumcision—but the medical literature provides an incubation period of 2-12 days.  R. Whitley & B. Roizman, *Herpes Simplex Virus Infections*, THE LANCET 357:1513, 1515 (2001); L. Rubin & P. Lanzkowsky, *Cutaneous Neonatal Herpes Infection Associated with Ritual Circumcision*, 19 PEDIATRIC INFECTIOUS DIS. J. 3:266, 267 (2000).

• In sum, the Department's report adopts a baseline HSV incidence rate that is too low; projects a level of incidence based on unduly low assumptions of the frequency of MBP; and reports an overstated level of actual incidence.  Despite those flaws, the report concludes that, out of more than 20,000 estimated instances of MBP, there were only *three or four* more cases of HSV than one would otherwise expect (*i.e.*, five cases over nearly six years, instead of 1.46).  As explained by Dr. Brenda Breuer, an epidemiologist at Beth Israel Medical Center, those numbers are so small that *any* errors in the calculations could eliminate entirely the alleged increased risk posed by MBP.  (*See* Aff. of Dr. Brenda Breuer ("Breuer Aff."), ¶ 9.)  Indeed, if there were only *four* cases of HSV after MBP—rather than the *five* identified by the Department—then there would indisputably have been no statistically significant association at all.  (*Id.* ¶¶ 7, 9, 11.)

• Moreover, exacerbating the problem posed by the report's tiny sample size, the researchers apparently did not define any time frame or sample size in advance of their study;

rather, they appear to have simply waited for the fifth case of HSV to push the data across the line from statistically insignificant to the allegedly statistically significant. (*Id.*, ¶¶ 6–7.) That type of gerrymandering of the data, according to Dr. Breuer, deprives the report's findings of meaningful statistical significance. (*Id.*) In addition, the report did not use proper formulae to compute its confidence interval, meaning that the report's findings might not be statistically significant even *accepting* its data and conclusions. (*See* Breuer Aff., ¶ 8; Federgruen Aff., ¶ 6.)

•       In light of these flaws, it is the professional belief of Dr. Berman, Dr. Breuer, and Dr. Federgruen alike that the Department's report does not support the alleged link between MBP and HSV. (*See* Berman Aff., ¶¶ 3, 21–22; Breuer Aff., ¶¶ 5, 11; Federgruen Aff., ¶¶ 3, 12.)

These experts' skepticism about the Department's report and conclusions is bolstered by the more meaningful figures supplied from Israel. Although it is estimated that there are nearly 20,000 MBP circumcisions in Israel *annually*, there have been only ten suspected cases of post-MBP neonatal herpes since January 2007. (*See* Federgruen Aff., ¶ 4.) Those figures suggest an incidence rate of HSV-1 following MBP that is, statistically, in line with the Department's projected *baseline* incidence rate. (*See id.*) That there is no additional risk is not surprising, given that the techniques that *mohelim* are trained to use are designed to eliminate the risk of transmitting disease. (*See* Heber Aff., ¶¶ 4, 6–7; Berman Aff., ¶¶ 18, 20.)

Given the well-founded dissent from the Department's theory, § 181.21 requires transmission of a "highly controversial" view. *Blagojevich*, 469 F.3d at 652. Like the experts cited above, many *mohelim* do not agree with the compelled disclosure, and they have at least a reasonable basis for their view. It does not matter, for these purposes, who is right and wrong. Either way, the regulation conflicts with the basic principle that government "may not compel affirmance of a belief with which the speaker disagrees." *Hurley*, 515 U.S. at 573.

c.    Finally, the regulation fails the requirement that mandated disclosures present only "non-misleading" information, *Lakey*, 667 F.3d at 576, that will not be "subject to misinterpretation," *R.J. Reynolds.*, 2012 WL 3632003, at *7.   For one thing, the disclosure says nothing about precautions that *mohelim* can take in performing MBP, and their significance in terms of any risk of HSV-1.   Nor does the disclosure *quantify* the risk, leaving parents uncertain of the actual dangers allegedly posed by MBP relative to other behaviors.   All behaviors, of course, present risks; what matters is their size.   Section 181.21 creates an "overall impression" that MBP is dangerous, but the truth is far different.   *CTIA-The Wireless Ass'n*, 827 F. Supp. 2d at 1062.   For this reason, too, the regulation fails even under *Zauderer*, and in fact undermines *Zauderer*'s goal of "dissipat[ing]" "consumer confusion," *In re R.M.J.*, 455 U.S. 191, 201 (1982).

\*                    \*                    \*

Protecting children from disease is exceptionally important.   But "[e]ven where the protection of children is the object, the constitutional limits on governmental action apply." *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2741 (2011).   In particular, the government cannot compel transmission of messages that the speaker does not want to express—especially when the speaker is operating in an area of heightened protection; especially when the message reflects subjective opinion; and especially in the face of an unsettled scientific debate.

## II.    PLAINTIFFS ARE LIKELY TO SHOW THAT THE REGULATION ABRIDGES THE FREE EXERCISE OF RELIGION BY TARGETING AN EXCLUSIVELY RELIGIOUS PRACTICE FOR SPECIAL AND UNWARRANTED BURDENS.

Section 181.21 singles out an exclusively religious ritual for special regulation, thus triggering the most demanding judicial scrutiny under the Free Exercise Clause of the First Amendment. The regulation cannot come close to satisfying that scrutiny, for multiple reasons. Further, even if one looks past the § 181.21's targeting of a ritual practice, its burdens cannot be outweighed, under New York's Constitution, by its speculative and (at best) marginal impact.

21

**A.** **Because § 181.21 Singles Out an Exclusively Religious Ritual for Disfavored Treatment, It Presumptively Violates the Federal Free Exercise Clause.**

1.        The First Amendment right to free exercise of religion includes both freedom to believe and freedom to act.  At the same time, religious practitioners are not constitutionally entitled to exemptions from every otherwise-applicable law that incidentally burdens religious exercise.  The Supreme Court has balanced these competing concerns: "neutral [laws] of general applicability" do not run afoul of the Free Exercise Clause, even if they have the "incidental effect of burdening a particular religious practice."  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *see also Employment Div. v. Smith*, 494 U.S. 872, 879–80 (1990).  By contrast, a "law failing to satisfy these requirements" of neutrality and general applicability is subject to strict scrutiny.  *Lukumi*, 508 U.S. at 531-32.

A law is not neutral and generally applicable where it reflects an "impermissible attempt to target … religious practices."  *Id.* at 535; *see also id.* at 524 (noting that laws have "impermissible object" if they apply "only with respect to conduct motivated by religious beliefs").  A "practical" inquiry governs, and so "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirements of facial neutrality." *Id.* at 534, 536.  Rather, "the effect of a law in its real operation is strong evidence of its object."  *Id.* at 535.  "[A] court must ask whether a law's impact on religious practices is merely incidental (in which case the regulation is neutral) or intentional and targeted (in which case it is not)."  *Stormans Inc. v. Selecky*, 844 F. Supp. 2d 1172, 1188  (W.D. Wash. 2012).

Accordingly, *Smith* concluded that a law generally prohibiting possession of controlled substances was neutral and generally applicable, because it was imposed without regard to religious practices and certainly not "*specifically directed* at [respondents'] religious practice" of ingesting a hallucinogenic drug known as peyote.  *Smith*, 494 U.S. at 878–82 (emphasis added).

22

In other words, the government had not singled out a religious practice for disfavored treatment; the ingestion of peyote for religious reasons constituted a miniscule fraction of the conduct regulated by the law. *Id.* By contrast, *Lukumi* invalidated ordinances regulating ritual slaughter, where "almost the only conduct subject to" the ordinances was "the religious exercise" associated with the Santeria faith. *Lukumi*, 508 U.S. at 535. There, "the burden of the ordinance[s], in practical terms, f[ell] on Santeria adherents but almost no others," suggesting that the ordinances attempted "to target" the Santeria church's practice of ritual animal slaughter. *Id.* at 534, 536, 542–43. As Justice Scalia, the author of *Smith*, explained, the critical distinction was that the *Lukumi* ordinances "through their design, construction, or enforcement target[ed] the practices of a particular religion." *Id.* at 557 (Scalia, J., concurring in part and in judgment).

2.      Here, like *Lukumi* and unlike *Smith*, there can be little doubt that § 181.21 is "specifically directed" at a particular religious practice. *Smith*, 494 U.S. at 878. The regulation is, by its very terms, limited to the context of "direct oral suction *as part of a circumcision*." (emphasis added). And this practice is exclusively a religious one; MBP is a Jewish ritual not practiced by anyone else. As in *Lukumi*, the ritual is "the only conduct subject to" the regulation, which was "drafted … to achieve this result." 508 U.S. at 536. Because it exclusively targets a religious practice for unique burdens, § 181.21 is not a neutral law of general applicability.

This reality is confirmed by review of the "'administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Commack Sel.-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 211 (2d Cir. 2012) (quoting *Lukumi*, 508 U.S. at 540 (opinion of Kennedy & Stevens, JJ.)). *First*, when the Department announced the proposal to adopt § 181.21, it admitted that the regulation was designed to target the "practice known as *metzitzah b'peh*" (Geremia Decl., ¶ 2 & Exh. 1), thus effectively conceding that its

23

regulation "refers to a religious practice without a secular meaning." *Lukumi*, 508 U.S. at 533 (majority opinion); *cf. Bronx Household of Faith v. Bd. of Educ. of the City of N.Y.*, No. 01 Civ. 8598, 2012 BL 44447, at *7 (S.D.N.Y. Feb. 24, 2012) (finding absence of neutrality where law barred "religious worship services" from school property); *Awad v. Ziriax*, 754 F. Supp. 2d 1298, 1307 (W.D. Okla. 2010) (determining that law prohibiting use of "Sharia law" was not neutral). *Second*, a Department official described the regulation as an effort to "regulat[e] how part of a religious procedure is done," Otterman, *City Urges*, *supra*, confirming that its *object* is to regulate a religious practice. *Third*, there is contextual evidence that § 181.21 represents part "of the city's efforts to curtail the ancient Jewish procedure of *metzitzah b'peh*," *id.*, just as the ordinances in *Lukumi* were an effort "to suppress Santeria religious worship," 508 U.S. at 540.

3.    The Department will likely respond that its regulation is motivated by a desire to prevent disease, not by animus to Orthodox Judaism, and that the regulation by its terms applies neutrally even to those who perform MBP for secular reasons.  Even accepting these assertions, however, neither changes the fact that § 181.21 is not a neutral law of general applicability.

a.    Whether the Department was motivated by animus toward religion, or was simply indifferent to it, § 181.21's *object* is an exclusively religious ritual, and that alone means that the statute is not a neutral law of general applicability.  As Justice Scalia, the author of *Smith*, explained in *Lukumi*, it does not matter "that a legislature consists entirely of the purehearted, if the law it enacts in fact singles out a religious practice for special burdens."  508 U.S. at 559 (Scalia, J., concurring in part and in judgment).  Thus, even if the ban on animal slaughter in that case had "been passed with no motive on the part of any councilman except the ardent desire to prevent cruelty to animals (as might in fact have been the case), they would nonetheless be invalid."  *Id.*  Consequently, as courts have recognized, animus toward religion is a *sufficient—*

24

but not a *necessary*—condition to establish a violation of the Free Exercise Clause.  *See, e.g.*, *Shrum v. City of Coweta*, 449 F.3d 1132, 1145 (10th Cir. 2006) ("[T]he Free Exercise Clause is not confined to actions based on animus." (citations omitted)); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1234 n.16 (11th Cir. 2004) ("Under *Lukumi*, it is unnecessary to identify an invidious intent in enacting a law …."); *see also* Douglas Laycock, *A Syllabus of Errors*, 105 MICH. L. REV. 1169, 1184 (2007) (describing the theory that animus is required as "false").  Thus, whatever the Department's subjective motivation, it cannot save § 181.21.

        b.     Nor can the Department hide behind the cant that § 181.21 is neutral and generally applicable because it applies to *anyone* who happens to "perform a circumcision that involves direct oral suction on an infant."  Where, as here, the conduct regulated is engaged in for exclusively religious reasons, it is of no moment that, in theory, the regulation could apply to conduct that is not so motivated.  As the Seventh Circuit observed, "[a] regulation that prohibited all private groups from displaying nine-pronged candelabra may be facially neutral, but it would still be unconstitutionally discriminatory against Jewish displays." *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1298 n.10 (7th Cir. 1996).  That is because, in "practical terms," *Lukumi*, 508 U.S. at 536—which is what matters—such a law would impact only adherents of a particular religion.  "The lack of general applicability is obvious not from the government's motives but from the narrowness of the regulation's design and its hugely disproportionate effect." *Grossbaum*, 100 F.3d at 1298 n.10.  The very same is true of § 181.21.

    4.     Because § 181.21 is not a neutral, generally applicable regulation, strict scrutiny applies.  *See Lukumi*, 508 U.S. at 546.  Section 181.21 cannot remotely satisfy this scrutiny.

        a.     As an initial matter, the Department cannot demonstrate that § 181.21 furthers a compelling interest.  To be sure, protecting children from transmission of disease is a

compelling interest.  But the government cannot regulate ritual circumcision in an effort to prevent transmission of neonatal herpes unless it can persuasively show that the religious practice *actually causes* that harm.  That is, the government must identify an "'actual problem' in need of solving."  *Brown*, 131 S. Ct. at 2738.  Importantly, when attempting to identify such a problem, the Department "bears the risk of uncertainty," meaning that "ambiguous proof," such as "predictive judgment[s] based on competing … studies" "will not suffice."  *Id.* at 2740.

Here, as explained, *see supra* at I.B.2.b, the scientific record is strikingly thin.  The Department has *no* definitive proof that MBP has ever caused HSV-1, and instead is trying to infer a relationship based on a flawed analysis of a handful of cases.  Meanwhile, evidence from the much larger sample size of Israel suggests that there is not even a correlation between MBP and HSV infection.  This record is simply too arguable and too speculative to establish that MBP creates an "actual problem."  Before taking the unprecedented step of regulating a venerable ritual that has been safely performed for millenia, the Constitution requires better evidence.

b.  Moreover, strict scrutiny prohibits underinclusivity:  "Where government restricts only conduct protected by the First Amendment and fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling."  *Lukumi*, 508 U.S. at 546-47.

Here, the regulation is woefully underinclusive, requiring health warnings to be given by *mohelim* prior to performing MBP, even though those *mohelim* would not be exhibiting any symptoms of the herpes virus (*see* Heber Aff., ¶¶ 6–7)—but not prior to the riskier contacts between infants and *symptomatic* individuals.  Even the Department's report estimates the risk of HSV-1 transmission associated with MBP at below 2 additional cases per 10,000 births.  That is an extremely low risk, far below the risk posed by contact between newborns and individuals

who exhibit symptoms of active HSV-1, such as cold sores.  (*See* Berman Aff., ¶ 18.)  In fact, there is compelling reason to believe that (at least) one of the five cases identified by the Department as an MBP-associated case of HSV involved transmission from a symptomatic sibling, who shared his pacifier with the infant shortly before the latter fell ill.  (*Id.* ¶ 13.)  Yet the Department ignored that evidence, and has taken *no* action with respect to this far more serious risk.  Instead, the *only* type of contact with infants that the Department has chosen to regulate is the exclusively religious practice of MBP.  Even on the Department's theory, only five of the 84 cases of HSV reported over the past nearly-six years could even *possibly* be linked to MBP.  Yet that small minority has been the sole focus of the Department's regulatory attention.  Perhaps the Department sees less value in the religious ritual of MBP than it sees in non-religious practices that pose the same or greater risks—but that is precisely the type of illicit disfavoritism toward religion that the  Religion Clauses are designed to prohibit.

        c.     Finally, as already explained, § 181.21 fails strict scrutiny because it is not the "least restrictive means to further [its] articulated interest." *Sable Comm'cns*, 492 U.S. at 126. Instead of forcing *mohelim* to transmit an anti-MBP message, the Department could pursue its own "educational campaign," *Blagojevich*, 469 F.3d at 652, to that same end.  *See supra*, I.A.4.

**B.**    **Even Evaluated Under the Balancing Test Embodied in the New York Constitution, the Regulation Cannot Survive.**

Even if improperly classified as a neutral law of general applicability, § 181.21 still violates *New York*'s Free Exercise Clause, which subjects every law burdening religion to a balancing test.  Given that those who adhere to the requirement of MBP are doing so out of religious belief, the Department's mandated disclosures are unlikely to have any material, real-world impact.  The regulation's minimal, highly speculative benefits cannot outweigh the harm to free exercise of mandating that religious actors convey advice that transgresses their faith.

1.    The New York Constitution declares that "[t]he free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all humankind."  N.Y. CONST. art. I, § 3.  The State's courts have long used a balancing test to enforce that clause, weighing "the interest of the individual right of religious worship against the interest of the State which is sought to be enforced."  *People v. Woodruff*, 26 A.D.2d 236, 238 (N.Y. App. Div. 1966).  Importantly, the New York courts refused to adopt "the inflexible rule of *Smith* that no person may complain of a burden on religious exercise that is imposed by a generally applicable, neutral statute."  *Catholic Charities of the Diocese of Albany v. Serio*, 7 N.Y.3d 510, 525 (2006).  Instead, even when the burden imposed on religious exercise is an incidental effect of a neutral and generally applicable law, the balancing test must be conducted to determine whether that burden is constitutional.  *Id.*  This approach, as the *Serio* Court explained, is "more protective of religious exercise than the rule of *Smith*."  *Id.* at 525.

This test allows for challengers to prevail even against important state interests.  For example, in *Matter of Rivera v. Smith*, 63 N.Y.2d 501 (1984), a Muslim prisoner prevailed on his claim that it would violate his faith for him to receive a "pat frisk" from a female officer; "the impingement on Rivera's religious convictions" outweighed the interest in maintaining prison security and providing employment opportunities to women.  *Id.* at 512-15.  The Second Circuit recently used the balancing test in holding that a town's interference with a church's building plans—on zoning-related grounds—was not reasonable.  *See Fortress Bible Church v. Feiner*, 2012 WL 4335158 (2d Cir. Sept. 24, 2012).  And *Serio* offered examples of generally applicable laws whose application to religious believers would fail its test, including a "prohibition of alcohol consumption," which "could make the Christian sacrament of communion illegal"; "uniform regulation of meat preparation," which "could put kosher slaughterhouses out of

business"; and "prohibitions of discrimination on the basis of sex," which "could end the male celibate priesthood." 7 N.Y.3d at 527 (quoting Michael McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 HARV. L. REV. 1409, 1418-19 (1990)).

2.      Section 181.21 fails this balancing test.  To begin with, as already explained, *see supra* at I.B.2.b, the risks supposedly inherent in MBP have not been conclusively proved.  Nor do the existing data, properly analyzed, suggest even a statistically significant correlation between HSV and MBP.  As explained, this is due in part to the safety precautions that *mohelim* are trained to use; as with most daily activities, any risk of HSV transmission through MBP largely dissipates with the exercise of ordinary care.  Moreover, even accepting the Department's view as to the health risks of MBP, it is very unlikely that its regulation will have any material impact on the practice of MBP in New York City.  MBP is practiced largely by the Hasidic and Orthodox communities.  Parents in those devout communities, believing themselves bound by a religious duty to include MBP as part of the ritual circumcision of their newborn baby boys, will not be dissuaded from fulfilling that duty by countervailing "advice" from a municipal agency.

If the Government's stated interest will not *actually* be advanced by a rule that impinges on religious convictions, the regulation fails the balancing test under New York law.  *See, e.g.*, *Rivera*, 63 N.Y.2d at 513-15 (holding that frisks by female officers would violate rights because it was not shown "that legitimate security objectives are advanced by having female correction officers randomly pat frisk Muslim male inmates").  That is the case here.  The Department has justified its regulation as advancing its interest in controlling the spread of HSV, but this interest will not be served in any real way by § 181.21's requirement that *mohelim* pass on "advice" from the Department that is based on faulty science and that, in any event, will almost certainly fail to dissuade any parents who consider themselves religiously bound to the MBP procedure.

While the Department can place only flimsy weights on the scale in defense of its regulation, the plaintiff *mohelim* have a real free-exercise interest at stake here.  Section 181.21 requires them to denigrate and undermine their own religious beliefs and rituals, by suggesting (i) that MBP is optional, even though the *mohelim* believe that no such choice exists under religious law; (ii) that MBP, although required by religious law, poses a threat to the health of the baby, even though the *mohelim* believe that no such threat exists; and (iii) that it is proper to consider the Department's position on matters of religious law, even though the *mohelim* believe that such issues fall outside the secular, civil authority of the municipal government.

On these facts, the dubious, unlikely benefits of § 181.21 cannot overcome the real, substantial harm that the regulation would work to the religious freedom of the plaintiff *mohelim*.

## III.   PLAINTIFFS ARE THREATENED WITH IRREPARABLE HARM, BECAUSE DEPRIVATION OF FIRST AMENDMENT RIGHTS CANNOT BE REMEDIED.

"[O]ur [nation's] historical commitment to expressive liberties dictates that 'the loss of First Amendment freedoms … unquestionably constitutes irreparable injury.'"  *Paulsen v. Cnty. of Nassau*, 925 F.2d 65, 68 (2d Cir. 1991) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Therefore, "[w]here a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed."  *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003); *accord  Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996) (compelled speech).  Likewise, "the denial of the plaintiff's right to the free exercise of his religious beliefs is a harm that cannot be adequately compensated monetarily."  *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).  Here, because the plaintiffs here have established a likelihood that they will succeed on the merits of their constitutional challenges to § 181.21, irreparable harm must be presumed.

## **CONCLUSION**

For the reasons given above, this Court should issue a preliminary injunction staying the Department's regulation pending this litigation.  For the same reasons, plaintiffs also respectfully request that the Court order that enforcement of § 181.21 be stayed from the date of oral argument, when the Department's voluntary stay expires, until the Court decides this motion.


Dated: October 16, 2012
      New York, New York

                             Respectfully submitted,
                             JONES DAY

                   By: /s/ Todd R. Geremia
                        Todd R. Geremia
                        222 East 41st Street
                        New York, New York 10017
                        Phone: (212) 326-3939
                        Fax:    (212) 755-7306

                        Michael A. Carvin*
                        Shay Dvoretzky*
                        Yaakov Roth*
                        51 Louisiana Avenue NW
                        Washington, DC 20001
                        Phone: (202) 879-3939
                        Fax:    (202) 626-1700

                        *Attorneys for Plaintiffs*

                           *\* application for admission pro hac vice pending*