**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CENTRAL RABBINICAL CONGRESS OF THE USA & CANADA, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE, *et al.*, <br><br> *Defendants.* | Case No. 12-Civ-7590 <br><br> Judge Naomi Reice Buchwald |

---

### REPLY MEMORANDUM OF LAW IN SUPPORT OF
### PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

---

Michael A. Carvin*
Shay Dvoretzky*
Yaakov Roth*
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone:  (202) 879-3939
Fax:  (202) 626-1700

Todd R. Geremia
JONES DAY
222 East 41st Street
New York, NY 10017
Phone: (212) 326-3939
Fax: (212) 755-7306

*Counsel for Plaintiffs*

* admitted pro hac vice

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 4

I.     THE REGULATION IS SUBJECT TO STRICT SCRUTINY UNDER THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT .......................................... 4

II.    THE REGULATION IS ALSO SUBJECT TO STRICT SCRUTINY UNDER THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT........................... 11

III.   THE REGULATION FAILS TO SATISFY CONSTITUTIONAL SCRUTINY........... 14

CONCLUSION.................................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) ..................................................................................................15

*Brown v. Entm't Merchants Ass'n*,
131 S. Ct. 2729 (2011) .........................................................................................1, 3, 19

*Capitol Square Review & Adv. Bd. v. Pinette*,
515 U.S. 753 (1995) ....................................................................................................5

*Caviezel v. Great Neck Pub. Sch.*,
739 F. Supp. 2d 273 (E.D.N.Y. 2010) .......................................................................11

*Centro Tepeyac v. Montgomery Cnty.*,
779 F. Supp. 2d 456 (D. Md. 2011) ...........................................................................11

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) .................................................................................12, 13, 14, 20

*Con. Edison Co. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 530 (1980) ....................................................................................................7

*CTIA-The Wireless Ass'n v. City & Cnty. of S.F.*,
Nos. 11-17707, 11-17773, 2012 BL 233403 (9th Cir. Sept. 10, 2012) .............5, 20

*CTIA-The Wireless Ass'n v. City of San Francisco*,
827 F. Supp. 2d 1054 (N.D. Cal. 2011) ..................................................................8, 20

*Edenfield v. Fane*,
507 U.S. 761 (1993) ...................................................................................................19

*Elrod v. Burns*,
427 U.S. 347 (1976) ...................................................................................................16

*Employment Div. v. Smith*,
494 U.S. 872 (1990) ..............................................................................................11, 12

*Entm't Software Ass'n v. Blagojevich*,
469 F.3d 641 (7th Cir. 2006) .....................................................................................15

*Evergreen Ass'n, Inc. v. City of New York*,
801 F. Supp. 2d 197 (S.D.N.Y. 2011) .......................................................................11

*FCC v. Beach Communications, Inc.*,
    508 U.S. 307 (1993) ..............................................................................20

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ...........................................................................8, 10

*Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*,
    100 F.3d 1287 (7th Cir. 1996) ............................................................12

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*,
    515 U.S. 557 (1995) ...............................................................................4

*Johanns v. Livestock Marketing Association*,
    544 U.S. 550 (2005) ...............................................................................8

*Locke v. Davey*,
    540 U.S. 712 (2004) .............................................................................13

*Lowe v. SEC*,
    472 U.S. 181 (1985) ...............................................................................9

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) ...............................................................................6

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
    475 U.S. 1 (1986) ................................................................................6, 7

*Planned Parenthood v. Rounds*,
    686 F.3d 889 (8th Cir. 2012) (en banc) ..............................................16

*Pleasant Grove City, Utah v. Summum*,
    555 U.S. 460 (2009) ...............................................................................8

*R.J. Reynolds Tobacco Co. v. FDA*,
    696 F.3d 1205 (D.C. Cir. 2012) ...................................................5, 8, 20

*Riley v. National Federation of the Blind of N.C.*,
    487 U.S. 781 (1988) ...........................................................................4, 15

*Rosenberger v. Rector & Visitors of the University of Virginia*,
    515 U.S. 819 (1995) ...............................................................................9

*Rubin v. Coors Brewing Co.*,
    514 U.S. 476 (1995) .............................................................................19

*Rumsfeld v. FAIR, Inc.*,
    547 U.S. 47 (2006) ..............................................................................6, 7

*Rust v. Sullivan*,
    500 U.S. 173 (1991)................................................................................8, 9, 10

*Shrum v. City of Coweta*,
    449 F.3d 1132 (10th Cir. 2006) ...........................................................14

*Strickland v. City of Seattle*,
    2009 U.S. Dist. LEXIS 81787 (W.D. Wash. Sept. 9, 2009)....................9

*Tex. Med. Providers Performing Abortion Servs. v. Lakey*,
    667 F.3d 570 (5th Cir. 2012) ...............................................................20

*Thomas v. Collins*,
    323 U.S. 516 (1945) .............................................................................10

*Video Software Dealers Ass'n v. Schwarzenegger*,
    556 F.3d 950 (9th Cir. 2009) ...............................................................15

*Wooley v. Maynard*,
    430 U.S. 705 (1977)........................................................................5, 7, 8

*Zakhartchenko v. Weinberger*,
    605 N.Y.S.2d 205 (Sup. Ct. 1993)........................................................9

*Zauderer v. Office of Disciplinary Counsel*,
    471 U.S. 626 (1985).......................................................................10, 20

**OTHER AUTHORITIES**

New York City Department of Health and Mental Hygiene, Press Release,
    http://www.nyc.gov/html/doh/html/pr2012/pr017-12.shtml. .................15

Saari-Kemppainen et al., *Ultrasound screening and perinatal mortality: controlled trial of systematic one-stage screening in pregnancyi*, THE LANCET, 336 (1990) .........................11

## INTRODUCTION

Predictably, the Department repeats that its goal—educating parents about what it maintains is a risk to infant health—is worthy.  But as the Supreme Court has warned, "[e]ven where the protection of children is the object, the constitutional limits on governmental action apply."  *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2741 (2011).  It is one thing for the Department to educate the public about what it perceives to be a risk posed by MBP.  But it is quite another to compel rabbis to transmit city bureaucrats' "advice" about whether to comply with Jewish law, thus singling out a religious ritual for unique regulation.  Compelling even a well-founded warning would be unconstitutional; the violation is all the more egregious when the Department, lacking any real proof of causation, proffers only a single, thoroughly debunked statistical study and casual, misinformed speculation about a few individual cases.

The Department advances a barrage of arguments why forcing *mohelim* to disseminate the Department's "advice" against MBP is not a compulsion to speak, but one is more outlandish than the next—and none can be squared with Supreme Court precedent.  Compelled speech on *religious* matters is no more permissible than compelled speech on *political* matters; compelled *written* speech is just as anathema as compelled *verbal* speech; compelled speech does not become constitutional simply by virtue of the speaker's ability to express his personal disagreement; nor does it help if the compelled message is attributed to the government, as being forced to transmit the government's views is precisely the constitutional *defect*.  And, as the Department concedes, *mohelim* are not licensed professionals; the regulation therefore cannot be defended as part of a comprehensive scheme governing their practice of a regulated profession.  In short, individuals operating outside the commercial arena, in a sphere of robust constitutional protection, and seeking no government benefits, cannot be compelled to disseminate even *factual* information at the government's behest—much less the government's subjective opinions.

1

As for free exercise, the Department contends that the regulation is permissible because it is facially neutral (even though it is limited by its terms to contacts during "circumcision") and generally applicable (even though the Department cannot give even a *single* situation, apart from MBP, where the regulation would apply). Yet the Department's experts concede that 90% of neonatal herpes cases are transmitted *maternally* either in utero or during childbirth. The Department offers no explanation for why it has ignored *those* risks (which could be reduced substantially by avoiding certain behaviors)—and every other situation posing a *proven* risk of postnatal transmission from caregivers—in favor of regulating the exclusively religious practice of MBP. However noble its motives, the Department's choices smack of just the type of subtle, implicit bias against religion that the federal and state Free Exercise Clauses stand against.

These intrusions on constitutional rights can be justified only by the most compelling interests; on the most robust showings of need; and in the absence of any plausible alternatives. Despite the Department's arguments to contrary, it cannot satisfy strict scrutiny here.

*First*, even accepting the Department's theory about MBP's alleged risks, the Department could easily satisfy its goal of educating parents about what it believes to be the risks of MBP through its *own* education efforts. Contrary to the Department's sole response, such efforts have *not* already failed. It was just *months* ago—at the *very same time* as it proposed this regulation— that the Department first convinced local hospitals to distribute its circumcision pamphlet to all new parents, and there is no reason why that solution should prove inadequate at all (much less *so* insufficient as to warrant this intrusion on constitutional rights). Moreover, even if the inquiry into the success or failure of the Department's educational campaign were not premature, the continued practice of MBP hardly proves failure, given that the Department's goal is simply to *educate* parents and enable them to make informed choices.

2

*Second*, while the Department and its experts repeat that transmission of HSV through MBP is "plausible" and that MBP "could be" a cause of HSV if a "perfect storm" occurred, the question is not whether transmission is *theoretically* possible, but whether it *actually* causes infection.  Plaintiffs have provided good reasons that it does not—including the substantial Israeli data, which the Department ignores; the precautionary measures that *mohelim* take, about which the Department admits to having no evidence; and the absence of any statistically significant increased risk after taking into account the defects of the Department's only statistical study, most of which the Department's affiants do not even try to defend.  By contrast, the Department has offered only speculation about 11 cases over 11 years—cases just as (if not more) easily reconcilable with alternative hypotheses—while refusing, unlike New York State did, to enter into a protocol for DNA testing that would finally settle the matter.

*Third*, the Department claims that just one parent *might* change his mind about MBP as a result of the regulation, and thereby it *might* prevent just one child from contracting herpes, and that, if so, the regulation is permissible.  That is powerful rhetoric, but if it were true, strict scrutiny would mean nothing, and government would be empowered to override constitutional rights at will.  Domino-effect speculation about probabilities just does not suffice to satisfy the most demanding standard known to constitutional law.  And "the government does not have a compelling interest in each marginal percentage point by which its goals are advanced."  *Brown*, 131 S. Ct. at 2741 n.9.  Here, the reality is that there exists, at most, a small and ever-shrinking number of people who remain unaware of the medical controversy surrounding MBP, and yet the Department has chosen to impose an across-the-board intrusion into an *allegedly* risky ritual while ignoring numerous other, *proven* risks of HSV transmission that are more substantial and more frequent, yet less well known.  Strict scrutiny demands a far tighter fit than this.

## ARGUMENT

I.   **THE REGULATION IS SUBJECT TO STRICT SCRUTINY UNDER THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT.**

When the Department published its notice of adoption of § 181.21, it explained that the regulation was promulgated "to require that persons who perform [MBP] … warn the parent of the Department's concerns about the risks of infection." (Geremia Decl., Exh. C-2.) The warning must specifically state that the Department "advises parents that [MBP] should not be performed." (*Id.*)  This is quintessential compelled speech:  The government is forcing those who do not share its view to nonetheless disseminate it to others.  Under Supreme Court precedent, that violates the First Amendment:  The Constitution protects "the choice of a speaker not to propound a particular point of view." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 575 (1995).  In its brief, the Department submits five arguments for why § 181.21 does not compel speech or is not subject to strict scrutiny.  All of them fail.  Indeed, the Department's arguments would in practice eviscerate the compelled-speech doctrine.

**A.**   The Department first contends that § 181.21 is constitutional because the message that it forces *mohelim* to transmit is not "ideological" or "political," but rather "purely factual." (Opp. 19.)  Even if that were true, it is legally irrelevant.  The Supreme Court has ruled, without ambiguity, that the "general rule, that the speaker has the right to tailor [his own] speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573.  Indeed, in *Riley v. National Federation of the Blind of N.C.*, 487 U.S. 781 (1988), the compelled message—namely, disclosure of the historical percentage of the charitable fundraiser's haul that was actually turned over to the charity—was indisputably factual, but the Court held that even such "compelled statements of 'fact'" impermissibly "burden[ed] protected speech." *Id.* at 797-98.

4

Anyway, the Department's premise is flatly wrong.  The regulation requires transmission of the Department's view that MBP "should not be performed."  That subjective judgment about the risks and benefits of a religious ritual is no more "purely factual" than were the City of San Francisco's "recommend[ations]" about how consumers should use cellular phones, *CTIA-The Wireless Ass'n v. City & Cnty. of S.F.*, Nos. 11-17707, 11-17773, 2012 BL 233403, at *1–2 (9th Cir. Sept. 10, 2012) (unpub.); or the FDA's "QUIT-NOW" message that tobacco manufacturers were to print on their product labels, *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1216 (D.C. Cir. 2012).  Moreover, it implicates a question of religious law, a topic *robustly* protected by the First Amendment.  *See Capitol Square Review & Adv. Bd. v. Pinette*, 515 U.S. 753, 760 (1995) ("[A] free-speech clause without religion would be Hamlet without the prince.").  Indeed, *Wooley v. Maynard*, the leading case on compelled speech, arose because the plaintiffs there considered the State's license-plate motto to be "repugnant to their moral, *religious*, and political beliefs."  430 U.S. 705, 707 (1977) (emphasis added).  The same is true here.

**B.**    The Department alternatively argues that the regulation does not compel *speech*, only "conduct," because the *mohel* "may choose to remain silent and merely deliver the written consent form"; he need not "engage in any conversation."  (Opp. 21.)  That is a startling claim.  Is the Department truly suggesting that only *verbal* communication is entitled to constitutional protection?  If that were so, the license plate in *Wooley* would have posed no problem, since the driver merely had to attach it to his car, not *say* anything.  *But see* 430 U.S. at 713 (invalidating requirement because it forced individuals to "participate in the dissemination of an ideological message by displaying it on his private property").  On the Department's theory, the State could conscript any person to distribute pro-life pamphlets (so long as the pamphleteer need not talk).  *But see CTIA*, 2012 BL 233403, at *1–2 (invalidating ordinance requiring distribution of City's

5

"fact sheet").  Or it could require newspapers to print particular editorials (which are merely written down).  *But see Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 254-58 (1974) (invalidating requirement that newspapers allow political candidates to respond to criticism).

The Department cites one precedent in support of this argument, but it does not resemble this case in the slightest.  In *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47 (2006), the Court considered a law requiring law schools to accord the U.S. military equal access to campus recruitment as other employers.  The Court reasoned that the law did not compel speech, because it "affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* at 60.  Allowing access to recruiters is not "speech" in any sense, and the Court found that it was "not inherently expressive."  *Id.* at 64.  By contrast, § 181.21 requires *literal dissemination* of the government's written message by the regulated party.  It is analogous, not to the equal-access policy in *FAIR*, but to a hypothetical law requiring law school deans to hand every student a note reading: "Congress advises you to support the troops and join the U.S. Army."

**C.**     Relatedly, the Department submits that its regulation poses no compelled-speech problem because the *mohel* is free to "express his personal objections" to the warning, even (apparently) on the form itself.  (Opp. 20.)  But the ability to dispute the compelled speech does not mitigate the constitutional violation.  As the Supreme Court has explained, "the State is not free … to force appellant to respond to views that others may hold."  *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 11 (1986) (plurality op.).  In *Pacific Gas*, the State sought to require a private utility to include a third-party's messages in its billing envelopes.  The Court explained that the utility would "be forced either to appear to agree with [those] views or to respond."  *Id.* at 15.  "That kind of forced response is antithetical to" the First Amendment, because "the choice to speak includes within it the choice of what not to say."  *Id.* at 16.  As in

6

*Pacific Gas*, the Department cannot require *mohelim* "to affirm in one breath that which they deny in the next." *Id.*; *see also Con. Edison Co. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 541 n.10 (1980) ("[W]e have consistently rejected the suggestion that a government may justify a content-based prohibition by showing that speakers have alternative means of expression.").

Although the Department attempts to distinguish *Wooley* on the basis that the speakers in that case could not lawfully "disavow the government's message" of "Live Free or Die" (Opp. 20), *Wooley* refutes the Department's point. The plaintiffs were forbidden to "cover up the motto on their license plates." 430 U.S. at 708. But, as the dissent pointed out (to no avail), they could have displayed a bumper sticker next to the license plate, reading: "I object to New Hampshire's motto"—or, to directly dispute the message: "Better Red Than Dead." *See id.* at 722 (Rehnquist, J., dissenting). Those options, of course, did not make the law constitutional.[1]

**D.**     Next, the Department contends that the MBP warning is *government* speech, and therefore permissible, because it "expressly identifies [the Department] as the speaker." (Opp. 24.) This argument reflects a confused perversion of government-speech doctrine. That doctrine allows the government to use its own property, money, and agents to express its own views. But that hardly means that it may conscript individuals to involuntarily transmit or disseminate the government's views. To the contrary, that is precisely what the First Amendment *prohibits*.

*All* compelled-speech cases involve forced expression of government or government-sanctioned messages, and so the fact that compelled speech reflects the government's views is obviously not an *answer* to the constitutional problem. In *Wooley*, for example, "Live Free or Die" was self-evidently the State's message; the problem was forcing dissenting individuals to

---

[1] The Department also, again, cites *FAIR* in support of its argument. (*See* Opp. 20.) But, as explained, that case turned on the fact that allowing access to military recruiters was not speech or expressive conduct. Had the law actually required the law schools to engage in expressive, pro-military speech, the constitutional violation would have been apparent—and not ameliorated by the schools' ability to disavow that compelled message.

display it.  *See* 430 U.S. at 713.  Likewise, the "QUIT-NOW" message on cigarette labels was obviously the FDA's view; the problem was forcing manufacturers to print it.  *See R.J. Reynolds*, 696 F.3d at 1216-17.  In *CTIA*, the "fact sheet" to be distributed by retailers listed actions that "San Francisco recommends"; it was still invalidated.  *CTIA-The Wireless Ass'n v. City of San Francisco*, 827 F. Supp. 2d 1054, 1058 (N.D. Cal. 2011).  The patent unconstitutionality of forcing individuals to declare that "abortion is murder" would not be cured if the message were altered to: "the State advises that abortion is murder."  As in these examples, while § 181.21 makes quite clear that it is the *Department* that advises against MBP, the problem remains that *mohelim* are being compelled to spread that government message against their will.

The government-speech doctrine is irrelevant to all of these cases, because that doctrine provides only that the government's *own* speech does not infringe on the speech rights of private parties.  For example, in *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009), the Court allowed the government to "accep[t] and displa[y]" monuments "on government land," *id.* at 471; this was government speech and did not interfere with any parties' First Amendment rights.  In *Johanns v. Livestock Marketing Association*, 544 U.S. 550 (2005), a government-created "Beef Board," paid for by a tax on cattle, established a promotional campaign for beef; the Court rejected a challenge to the tax, because citizens "have no First Amendment right not to fund government speech."  *Id.* at 553-54, 562.  The rationale of these cases is that the government and its agents may use government property and money (including taxes) to express government views.[2]  They hardly support the radically different proposition that the government can impose upon *private* speech by conscripting private speakers to convey its message.

---

[2] *See also Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006) (holding that speech by government employee, "pursuant to his duties," is government speech); *Rust v. Sullivan*, 500 U.S. 173, 183 (1991) (allowing government "to subsidize family planning services" relating to "childbirth" without also subsidizing abortion counseling).

Indeed, no case even *hints* that the government may *compel* private speakers to express its views—which would swallow the compelled-speech doctrine.  The Department misleadingly quotes *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819 (1995), for the proposition that the government may "enlis[t] private entities to convey its own message," *id.* at 833.  That case did not involve compelled speech.  Rather, the Court was addressing *voluntary* enlistment, explaining that the government need not be viewpoint-neutral when it "disburses public funds to private entities to convey a governmental message."  *Id.*  As an example, the Court cited *Rust v. Sullivan*, which involved regulations governing the speech of individuals who were "voluntarily employed" on a "Government-funded project."  500 U.S. 173, 198-99 (1991).  Like anyone, the government can *hire* private parties to convey its message—but cannot *force* them.[3]  Here, as the *mohelim* are not willing government agents, this doctrine is entirely inapt.

   **E.**      Finally, the Department submits that § 181.21 is exempt from strict scrutiny because it falls within the government's "broad authority to regulate those who perform medical procedures."  (Opp. 25.)  It is true, as plaintiffs explained, that the general power "to regulate the professions is not lost whenever the practice of a profession entails speech."  *Lowe v. SEC*, 472 U.S. 181, 228 (1985) (White, J., concurring).  That is, a professional who is licensed by the State and whose exercise of his profession is comprehensively regulated may, as part of that regulatory scheme, be subject to incidental speech restrictions or compulsions.  But, as the Department does not dispute, "a circumcision performed as a religious ritual … does not constitute the practice of the profession of medicine."  *Zakhartchenko v. Weinberger*, 605 N.Y.S.2d 205, 206 (Sup. Ct. 1993).  The doctrine that the Department invokes is therefore categorically inapplicable.

---

[3] Similarly, *Strickland v. City of Seattle*, 2009 U.S. Dist. LEXIS 81787 (W.D. Wash. Sept. 9, 2009), involved a condition for receipt of a government permit.  *See id.* at *2.  Moreover, the plaintiff in that case was "not compelled to deliver" the government-approved best management practices plan "himself"—he merely had to "propose a way" to inform his tenants of the plan.  *Id.* at *15.  It is therefore doubly inapposite here.

The Department responds that it would be "perverse" for *mohelim* to be free of the rules that govern doctors "merely because they are exempt from licensing requirements." (Opp. 26.) In fact, the State's determination to exempt *mohelim* from licensing reflects a number of salient respects in which they differ from doctors. And the distinctions that preclude treating *mohelim* as doctors for *licensing* purposes also preclude treating them like doctors for *speech* purposes. *First*, doctors who require government licenses must comply with conditions attached thereto— just like those who accept jobs or funding from the government. *Cf. Garcetti*, 547 U.S. at 421-22; *Rust*, 500 U.S. at 198-99. By contrast, *mohelim* seek nothing from the government; there is no government benefit to which to attach conditions. *Second*, doctors accrue substantial financial rewards from licensure; they practice commercially, triggering the "less extensive" protection due in that context. *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985); *see also Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring) (justifying professional-speech doctrine as part of State's "duty to protect the public from those who seek … to obtain its money"). By contrast, the motivation of *mohelim* is spiritual, not financial, and so is entitled to greater constitutional protection.[4] *Third*, doctors must be licensed because the State oversees, supervises, and regulates nearly everything that they do. By contrast, *mohelim* are not licensed because they *cannot* be so regulated. As the Department does not dispute, licensing ministers or supervising performance of a religious ritual would violate the Establishment Clause.

The Department cites *no* cases applying the professional-speech doctrine to anyone who is not a licensed professional. The only two cases that *have* addressed this issue both concluded,

---

[4] The Department does not argue that *Zauderer*'s doctrine allowing "purely factual and uncontroversial" disclosures in commercial advertising should govern here, presumably because—as plaintiffs explained—*mohelim* are religious ministers, not commercial actors. The Department does suggest that "the principles" of *Zauderer* support § 181.21, because the regulation addresses "a grave public health risk." (Opp. 28 n.20.) That, however, affects only whether the regulation survives judicial scrutiny—not the level of scrutiny that applies.

agreeing with plaintiffs' position here, that the government could not require pregnancy centers to make disclosures because they did not practice medicine.  *Evergreen Ass'n, Inc. v. City of New York*, 801 F. Supp. 2d 197, 207 (S.D.N.Y. 2011); *Centro Tepeyac v. Montgomery Cnty.*, 779 F. Supp. 2d 456, 465 (D. Md. 2011).  The Department tries to distinguish these by claiming that the purpose of § 181.21's disclosures is more important (Opp. 27), but that goes to whether the rule *satisfies* scrutiny.  The Department also points out that, unlike circumcisions, the ultrasounds provided by the centers were "non-invasive."  (*Id.*)  But that had nothing to do with the cases' reasoning, which was that "no license or accreditation of ultrasound technicians is required," *Evergreen*, 801 F. Supp. 2d at 207; anyway, research shows[5] that the miscarriage risk associated with ultrasounds is an order of magnitude *higher* than the HSV risk allegedly related to MBP.[6]

## II.  THE REGULATION IS ALSO SUBJECT TO STRICT SCRUTINY UNDER THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT.

The Department observes that religious actors are not automatically entitled to special exemptions from incidental burdens on religious exercise.  (Opp. 5-8.)  Thus, for example, those who use drugs for religious reasons are not exempt from drug laws, *see Employment Div. v. Smith*, 494 U.S. 872, 878-82 (1990); and those who have religious objections to vaccination are not exempt from vaccination requirements, *see Caviezel v. Great Neck Pub. Sch.*, 739 F. Supp. 2d 273, 284 (E.D.N.Y. 2010).  But these authorities are irrelevant to plaintiffs' contention that § 181.21 impermissibly *targets* their ritual and thus is neither neutral nor generally applicable.

A.    The Department first argues that § 181.21 is both "facially neutral" and "generally applicable" because it is not limited to oral suction conducted for religious reasons.  Rather, "any

---

[5] *See* Saari-Kemppainen et al., *Ultrasound screening and perinatal mortality: controlled trial of systematic one-stage screening in pregnancy*, THE LANCET, 336: 387–91 (1990).

[6] Even if § 181.21 could be squeezed into the doctrinal category of professional speech, the regulation is still unconstitutional for reasons explained below.  *See infra* Part III.D.

such conduct for any other purpose is also intended to be covered." (Opp. 6.) But § 181.21 is expressly limited to "direct oral suction *as part of a circumcision*." Moreover, the Department concedes that § 181.21 was motivated by MBP, which is "the only presently known conduct" covered by the regulation. (Opp. 6 & 9 n.8.) The theoretical possibility of application to a non-religiously-motivated circumcision using oral suction—which there is no record to suggest has ever occurred and no reason to believe ever will—does not make the regulation generally applicable. Rather, like a law banning "bowing down before a golden calf," *Smith*, 494 U.S. at 877-78, or "nine-pronged candelabra," here "[t]he lack of general applicability is obvious … from the narrowness of the regulation's design and its hugely disproportionate effect." *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1298 n.10 (7th Cir. 1996).

  **B.** The Department maintains that, even if the regulation targets MBP, it was enacted for good reasons, and "in spite of" MBP's religious significance. (Opp. 9.) If secular conduct posed similar risks, the Department argues, then it too would have been regulated. (*Id.*)

  Legally, the Department's purportedly noble motivation is irrelevant. As Justice Scalia explained in *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, even if "a legislature consists entirely of the purehearted," a law that "in fact singles out a religious practice for special burdens" violates the Constitution. 508 U.S. 520, 559 (1993) (Scalia, J., concurring in part and in judgment). What matters is the regulation's *objective impact* in "practical terms," *id.* at 536 (majority op.), and the practical burden of § 181.21 will fall entirely on Jews who practice MBP.

  Moreover, the Department's factual claim fails. Even according to the Department, MBP is indisputably *not* the only cause of neonatal herpes; in the Department's report, 79 of the 84 reported cases (including 13 fatalities) did *not* follow MBP. As the Department's experts attest, 90% of cases are transmitted from *mothers*, in utero or during childbirth, while the remaining

10% arise from postnatal transmission.  (Farley Decl., ¶ 13.)  Yet the Department has devoted all of its attention to the tiny fraction of that 10% allegedly attributable to MBP.  What has it done to address the risks of contact with other breaks in infants' skin, outside the circumcision context?  Or to protect infants with non-MBP circumcisions from infection?  All of these risks exist, and indeed have been *proved* to cause HSV (whereas MBP has never been proved as a cause).

Even more starkly, what has the Department done about the 90% of cases that arise from maternal transmission?  Caesarean delivery greatly reduces that risk and so is used for women with signs of active herpes at delivery (*see id.*), but as the Department's experts emphasize, even asymptomatic persons may shed virus (*id.* ¶ 10)—that, indeed, is its theory for transmission by *mohelim*.  Why, then, are warnings not required before *every* vaginal birth, advising caesarean delivery?  Presumably the Department would respond that the risk is small and there are other benefits to natural delivery.  True, but just as true of MBP—except its benefits are *religious*— and thus, to the Department, nonexistent.  As in *Lukumi*, where the city banned ritual sacrifice but not "hunting or fishing for sport," the disproportionate attention paid to MBP "devalues religious reasons for" exposure to risk "by judging them to be of lesser import than nonreligious reasons."  508 U.S. at 537-38.  That undermines the claim of a secular objective, and shows just the type of bias against religion that triggers strict scrutiny.[7]

**C.**     The Department tries to distinguish *Lukumi* by observing that the ordinances there "contained many exceptions, supporting the conclusion that they were explicitly targeted at the religious exercise of the Santeria church."  (Opp. 6.)  Quite so:  The Court noted that "almost the only conduct subject [to the ordinances] is the religious exercise of Santeria," suggesting "that

---

[7] The Department argues, citing *Locke v. Davey*, 540 U.S. 712 (2004), that government need not be neutral as to religion.  (Opp. 7.)  But *Locke* was about the State's decision "not to fund" religious instruction on the same terms as secular instruction.  540 U.S. at 721.  The law there "impose[d] neither criminal nor civil sanctions on any type of religious service or rite."  *Id.* at 720.  Section 181.21 does, by contrast, impose real penalties.  (Opp. 8 n.7.)

Santeria alone was the exclusive legislative concern."  508 U.S. at 535-36.  Here, the Department has actually gone *further*.  Rather than draft a general law and then narrow it through exceptions so that "*almost* the only conduct" covered is religious, the Department has drafted a regulation so facially narrow that, without the need for any exceptions, "the *only* presently known conduct" covered is MBP.  (Opp. 6 (emphasis added).)  And the Department candidly admits that MBP "prompted" the regulation.  (Opp. 9.)  These "distinctions" do not help the Department.  In any event, *Lukumi* held that the ordinances at issue there fell "*well below* the minimum standard necessary to protect First Amendment rights."  508 U.S. at 543 (emphasis added).  Whatever differences may exist between this case and *Lukumi*, they do not change the bottom line: that § 181.21, by uniquely burdening a religious practice while ignoring other behaviors that carry the same or greater risks of HSV transmission, is inconsistent with the First Amendment.[8]

## III.    THE REGULATION FAILS TO SATISFY CONSTITUTIONAL SCRUTINY.

For three *independent* reasons, § 181.21 cannot satisfy strict scrutiny.  *First*, despite the Department's protest that its educational efforts have failed, the most comprehensive of those initiatives was instituted only a few months ago, at the same time that § 181.21 was proposed; this regulation is thus hardly the "last resort" required by the caselaw.  *Second*, the Department proffers speculation that MBP poses a *theoretical* risk, but has no real proof that MBP *actually* spreads disease—and has refused to agree to a DNA protocol that would settle the question once and for all.  Speculation, without evidence of causation or even statistically significant evidence of correlation, cannot satisfy the government's burden of proving a compelling interest.  *Third*, § 181.21 is simply a very poor fit for the Department's stated goals.

---

[8] The Department also argues that *Lukumi* is distinguishable because the record in that case evinced animus toward Santeria.  (Opp. 6 n.5.)  But the cited portion of *Lukumi* was not joined by a majority of the Court.  *Lukumi*, 508 U.S. at 541 (op. of Kennedy, J.).  That is why lower courts have held that "the Free Exercise Clause is not confined to actions based on animus."  *Shrum v. City of Coweta*, 449 F.3d 1132, 1145 (10th Cir. 2006).

**A.**      The Department concedes that § 181.21 would be permissible only (if at all) as "a last—not first—resort."  (Opp. 30 (quoting *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002).)  Yet the Department's goal of educating parents about what it perceives to be the risks of MBP could easily be accomplished without imposing on anyone's First Amendment rights, through an educational campaign by the Department itself.  As the Department correctly points out, *government* speech is not subject to Free Speech Clause scrutiny.  (Opp. 22-23.)  In light of the less restrictive option of government-run education, numerous courts have invalidated even well-intentioned attempts to compel private speech.  *See, e.g.*, *Riley*, 487 U.S. at 800; *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 965 (9th Cir. 2009); *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006).

The Department responds that it has tried educational campaigns, but that they succeeded only "in part."  (Opp. 15.)  But it is far too early to make such a determination.  Critically, while the Department has provided "literature to City hospitals for distribution with parental discharge papers" (Opp. 15), the record shows that this began just a few months ago, simultaneously with the Department's proposal of § 181.21.  Specifically, in June 2012, the Department announced that it had secured the agreement of local hospitals to distribute its *Before the Bris* pamphlet to all new parents considering circumcision.  *See* http://www.nyc.gov/html/doh/html/pr2012/pr017-12.shtml.  As explained at the public hearing on § 181.21, only "[v]ery recently" did the Department obtain "support of all of the … hospitals that see the preponderance of orthodox Jewish families … to distribute a brochure … [that] educates parents about this issue."  (Dkt. No. 26-1, at 14.)  The Department simply cannot explain (and the burden "is on the Government," *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004)) how this effort can already be deemed inadequate, justifying the "last resort" of compelled speech.  Nor can it explain why being informed about

MBP just minutes before the circumcision would somehow be more effective than distribution of a brochure eight days *before* the ritual, when parents still have some time to digest its contents.[9]

**B.**       There is no dispute that the government has a compelling interest in preventing HSV.  The dispute is over whether MBP causes such transmission.  Contrary to the Department (Opp. 13), "the burden is on the government to show the existence of [a compelling] interest." *Elrod v. Burns*, 427 U.S. 347, 362 (1976).  And while the Department cites *Planned Parenthood v. Rounds*, 686 F.3d 889 (8th Cir. 2012) (en banc), for the proposition that "certainty" need not be proved, that case upheld a warning—outside the strict scrutiny context—where "numerous studies published in peer-reviewed medical journals … demonstrate[d] a statistically significant correlation" and "nothing in the record … suggest[ed] that the underlying data or calculations in any of these studies [was] flawed."  *Id.* at 898.  By contrast, the standard here is strict scrutiny, and the Department has but *one* study from a *non*-peer-reviewed journal purportedly finding such a link, which plaintiffs have thoroughly dismantled and discredited as discussed below.

Obviously, the best way to prove that MBP causes HSV would be with DNA evidence showing that a *mohel* infected an infant.  The Department's experts agree that such proof would be "definitive."  (Zenilman Aff., ¶ 34.) But the Department has none.  Not for lack of opportunity; representatives of the Jewish community negotiated in 2006 a protocol with New York State, providing for DNA testing of any *mohel* who performed MBP on an infant who developed HSV.  (*See* Dkt. No. 33-10, at 11-12.) [10]  New York City, however, refused (and refuses) to sign on—

---

[9] Moreover, even if the time had come to measure the efforts' success, by what measure have they failed?  The fact that MBP continues to occur does not prove failure if the goal is to ensure awareness of MBP's risks.

[10] The Department's claim that the protocol's signatories "agreed" that MBP causes infection (Opp. 12 n.9) is patently false.  The quoted language says only that "*there is a theory in some medical literature* that … [MBP] could be a route of transmission for HSV-1."  (Dkt. No. 33-10, at 9 (emphasis added).)  And the New York State Department of Health agreed with that wording—that this is a "theory," not a proven link.

and since most MBP circumcisions occur in New York City, DNA tests that would settle this matter once and for all still have not been performed.  (Aff. of Robert Simins, ¶¶ 5-18.)

Since DNA evidence is lacking, the Department's experts resort to arguing that direct oral suction is theoretically *capable* of transmitting HSV.  Thus, a link between MBP and HSV has "biological plausibility" (Stanberry Aff. ¶ 7); MBP "could well be a source" of infection (Zenilman Aff. ¶ 19); infection could occur in a "perfect storm" of factors (Farley Decl., ¶ 54).  But there is a critical difference between *theoretically plausible* transmission—which nobody disputes—and transmission *actually occurring*.  There are many examples of "biologically plausible" links that have never been proved and that are therefore assumed not to exist *in practice*.  (Supp. Aff. of Dr. Daniel S. Berman ("Berman Supp. Aff.", ¶¶ 4-7.)  As to MBP, the speculated risk might well not manifest in practice, perhaps due to the brief nature of the contact (*i.e.*, about one second) or the precautions that *mohelim* take (*e.g.*, antiseptic rinsing).  (*Id*. ¶ 8.)

A statistically significant link between HSV and MBP would be at least circumstantial evidence of causation—and, indeed, the Department's MMWR study purporting to show such a link was the very premise and impetus for § 181.21.  But the Department and its experts barely engage with the showing by plaintiffs that the Department's study, based on five cases over 5.75 years, does *not* show any statistically significant correlation.  In particular, the Department's expert concedes that, after adjusting for just *one* of the study's many implausible assumptions about the number of MBP circumcisions in New York City, the MBP-HSV association is not statistically significant. (*See* Gelman Aff. ¶ 19.)[11]  And the Department's brief—which reports complaints about MBP from non-Orthodox parents (Opp. 17)—highlights *another* substantial

---

[11] Dr. Gelman claims that the relationship regains statistical significance if one adds six HSV cases reported before 2006. (Gelman Aff. ¶ 23.)  But HSV was not then a reportable disease, so there is no "control group" for that period—which is why the MMWR study did not include these cases.  Dr. Gelman's "extrapolat[ion]" of a control group is blatantly improper.  (*See* Supp. Aff. of Dr. Awi Federgruen , ¶ 28.)

flaw in the study, which assumed that MBP occurred exclusively among Hasidic and Orthodox families.  (Supp. Aff. of Dr. Awi Federgruen, ¶¶ 12-14.)  Accounting for this error shows that the actual population of infants exposed to MBP during the MMWR study period was much higher than the study estimated—and that the risk of contracting HSV was therefore much lower, no different in any statistically significant way from the risk in the general population.  (*Id.* ¶ 15; *see also* Aff. of Dr. David M. Zucker, ¶¶ 4-15 (corroborating and elaborating statistical flaws).)

Instead of defending the flawed finding of a statistically significant link, defendants' experts—who never even reviewed the medical histories for the 11 reported cases—insist that facts from "the case data alone" suffice.  (Kimberlin Aff. ¶ 8.)  They point, in particular, to (i) the timing of the HSV infections, *i.e.*, that they occurred after the circumcisions, and (ii) the location of the lesions, *i.e.*, that they presented on the genitals.  (Wald Aff. ¶¶ 12-13; Zenilman Aff. ¶ 24; Kimberlin Aff. ¶ 6.)  But, of the 11 cases, at least four actually fell *outside* the expected incubation period had transmission occurred during MBP, but *within* the expected time frame had transmission occurred at birth or via other contacts.  (Berman Supp. Aff. ¶¶ 9-17.)  As for the lesions, the textbook on pediatric infectious disease states that they "tend to appear at sites of trauma," and so it is hardly surprising that circumcised boys would have genital lesions— whatever the virus' source.  (*See id.* ¶¶ 19-20.)  Moreover, only the site of the *initial* lesions can be probative of the site of infection, yet the MMWR study tellingly does not say—for any of the cases—where initial lesions presented.  (*Id.* ¶ 22.)  In the one case that plaintiffs' experts have independently investigated, the infant's mother stated that the first lesion appeared on the *foot*, and the attending physicians reported no findings of genital lesions *at all*.  (*See id.* ¶ 24.)[12]

---

[12] The Department misleadingly claims that Dr. Berman "publicly recanted" his testimony about MBP's risks of HSV transmission.  (Opp. 12.)  He said only that MBP may have transmitted *syphilis or tuberculosis* more than 60 years ago.  (Opp. 12 n.10.)  Neither disease is at issue in this litigation.  (*See* Berman Supp. Aff., ¶ 7 n.1.)

We are left with an association that is not statistically significant, and a handful of cases that—when considered objectively, in light of all of the facts—do not single out MBP as their cause or exclude others.  (*See id.* ¶¶ 26-34.)  In addition, there is the more substantial data set from Israel, which contradicts the Department's theory of an elevated risk but which the Department ignores.  (Federgruen Aff., ¶ 4; *see also* Aff. of Dr. Alan Werzberger, ¶ 6 (reporting 1 HSV case after 10,000 MBP circumcisions in Kiryas Joel, New York, and that *mohel* tested negative for HSV.)  All of this fairly suggests that the nature of MBP and the precautions taken by *mohelim*, about which the Department's expert admits that data are "lacking" (Zenilman Aff. ¶ 35), prevent the theoretical risk of transmission of HSV from manifesting in practice.

**C.**     Strict scrutiny also requires that the law be narrowly tailored to its purpose— neither overinclusive nor underinclusive.  But § 181.21 is both.  As the Department admits, "many of the public outreach steps" it has taken have been "successful."  (Farley Decl., ¶ 90.)  Its efforts resulted in "broad press coverage," and its outreach "has reached the medical community."  (*Id.* ¶¶ 91 n.9, 92.)  These efforts already "d[o] much to ensure" that parents make informed choices, *Brown*, 131 S. Ct. at 2741, and that must be taken into account in the scrutiny analysis.  To the extent that a small number remain ignorant, "[f]illing the remaining modest gap … can hardly be a compelling state interest."  *Id.*  The Department speculates that § 181.21 might "preven[t] just one infant from contracting HSV."  (Opp. 14.)  That is good rhetoric, but it is not the law.  A regulation that "provides only ineffective or remote support" for its purpose cannot survive, *Edenfield v. Fane*, 507 U.S. 761, 770 (1993); and the government cannot meet its burden by "speculation or conjecture," *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995).

Nor does § 181.21 address the risks of HSV evenhandedly.  Rather, it targets only MBP even though other behaviors have been *proved* to carry the same or higher risks of transmission

19

that MBP is *alleged* to carry.  *See supra* Part II.B.  This massive underinclusivity reflects the Department's belief that *any* risk associated with MBP warrants regulation, because it—unlike these other risky behaviors—is merely a religious practice with no social utility or benefit.[13]

**D.**      Even if strict scrutiny does not apply to § 181.21, the warnings—at minimum— must be purely factual, indisputable, and clear.  *See Zauderer*, 471 U.S. at 651 ("purely factual and uncontroversial"); *R.J. Reynolds*, 696 F.3d at 1216 ("indisputably accurate"); *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 576 (5th Cir. 2012) ("truthful [and] nonmisleading").  They are not.  Most obviously, the Department's "advice" about whether to perform MBP is clearly *opinion*.  The Department's response—that "it is truthful that DOHMH advises against [MBP]" (Opp. 26 n.18)—is too clever by half.  Opinions cannot be transformed into facts simply by identifying them as opinions.  Otherwise it would be perfectly constitutional for the government to require abortion providers to warn not only that "abortion carries risks" but also that "the State advises that abortion not be performed."  *Cf. CTIA*, 827 F. Supp. 2d at 1058 (invalidating compelled distribution of fact sheet listing acts that "the City of San Francisco recommends").  Furthermore, the disagreement about the *actual* risks of MBP, which continues to be aired in the competing expert affidavits, proves that the warnings are not "uncontroversial." *See CTIA*, 2012 BL 233403, at *1–2.  And the omission of information about the *size* of the risk, or the potential mitigating effects of certain precautions, leaves the overall warning misleading.

**E.**      Finally, for all of the same reasons, § 181.21 cannot survive even the balancing test applicable under New York's Free Exercise Clause.  (*See* Pltfs.' PI Brief, Part II.B.)

---

[13] To the extent that the Department suggests that it may permissibly "regulate piecemeal" (Opp. 14 n.14), that is wrong.  "Where government restricts only conduct protected by the First Amendment and fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling."  *Lukumi*, 508 U.S. at 546-47.  The contrary case cited by the Department, *FCC v. Beach Communications, Inc.*, 508 U.S. 307 (1993), applies *rational basis review.*

## CONCLUSION

For the reasons given above, this Court should issue a preliminary injunction staying the Department's regulation pending this litigation.  For the same reasons, plaintiffs also respectfully request that the Court order that enforcement of § 181.21 be stayed from the date of oral argument, when the Department's voluntary stay expires, until the Court decides this motion.


Dated: November 30, 2012
       New York, New York

                          Respectfully submitted,
                          JONES DAY

                       By: /s/ Shay Dvoretzky___
                          Shay Dvoretzky*
                          Michael A. Carvin*
                          Yaakov Roth*
                          51 Louisiana Avenue NW
                          Washington, DC 20001
                          Phone: (202) 879-3939
                          Fax:    (202) 626-1700

                          Todd R. Geremia
                          222 East 41st Street
                          New York, New York 10017
                          Phone: (212) 326-3939
                          Fax:    (212) 755-7306


                          *Attorneys for Plaintiffs*

                          * admitted pro hac vice